UNITED STATES of America, Appellee,

v.

Arthur BRECHT, Defendant-Appellant.

No. 953, Docket 76–1049.

United States Court of Appeals, Second Circuit.

Argued April 21, 1976.

Decided July 16, 1976.

Sheila Ginsberg, The Legal Aid Society, New York City (William J. Gallagher, The Legal Aid Society, New York City, of counsel), for defendant-appellant.

Cheryl M. Schwartz, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., and Paul B. Bergman, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for appellee.

Before MOORE, FEINBERG and GUR-FEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This is an appeal by Arthur Brecht from a conviction on three counts of an indictment entered in the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) after a jury trial. Appellant was convicted on Counts One, Four and Six. Count One charged a violation of 18 U.S.C. § 1951 (the Hobbs Act), an interference with interstate commerce by means of extortion.[1] Counts Four and Six charged a violation of 18 U.S.C. § 1952 (the Travel Act), by travel between Pennsylvania and New York to carry on an unlawful activity, namely, larceny by extortion and commercial bribe receiving in violation of Sections 155.05(2)(e)(ix) and 180.05 of the New York Penal Law.[2] Appellant was sentenced to concurrent terms of two years' imprisonment on each count. Execution of the sentence was suspended, and a period of three years' probation was imposed.

Appellant Brecht was employed by Westinghouse Electric Corporation of Lester, Pennsylvania ("Westinghouse") as manager of its technical publications group. Westinghouse held a $23,000,000 prime contract with the El Paso Electric Company of El Paso, Texas ("El Paso"), for the construction of a power generating plant at Newman, Texas. Under this contract, Westinghouse had the responsibility to deliver to El Paso various technical manuals explaining the operation and maintenance of Westinghouse's equipment. National Technical Publications, Inc. of Dix Hills, New York ("National"), was in the business of producing technical manuals and publications for prime contractors in various states and had submitted a bid for the production of the technical manuals and publications required by Westinghouse for delivery to El Paso. National was substantially engaged in interstate commerce and Joseph Racker ("Racker") was its President.

The evidence presented at trial showed that appellant had the discretion to determine whether the required technical manuals would be produced "in house" or by subcontractors, and that his selection of a subcontractor had always been approved by Westinghouse. The evidence also showed that after National had submitted its bid on the manuals, Racker travelled from Pennsylvania to New York and met with appellant to discuss the bid. At these meetings, appellant demanded a $1,000 kickback as a condition for the award of the contract to National. After Racker received the first demand for a kickback, he contacted the FBI, and the FBI arranged for him to tape his subsequent meetings with appellant. At appellant's final meeting with Racker, Racker handed to appellant an envelope containing a $500 check and five $100 bills.

1. Section 1951 provides in relevant part as follows:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

2. Section 1952 provides in relevant part as follows:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified . . ., shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this section 'unlawful activity' means . . . (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States."

After the meeting, appellant was arrested by FBI agents, and the envelope containing the check and the cash was found on his person.

Appellant's sole theory of defense was that Racker had paid him the money as the purchase price for 215 shares of stock of the Ace Publishing Corporation. The jury rejected this defense and convicted appellant on three counts of the indictment.

At the close of the government's case, the appellant moved for a judgment of acquittal on the Travel Act counts, arguing *inter alia,* that "commercial bribery" is not encompassed by the word "bribery" in the Travel Act. In a separate motion on the Hobbs Act count, appellant argued that the evidence was insufficient to establish extortion.

I.

We first consider whether the government has proved a crime under the Travel Act, 18 U.S.C. § 1952, which proscribes interstate travel to promote any "unlawful activity," including "bribery . . . in violation of the laws of the State in which committed." The prosecution contends that the term "bribery" used in § 1952 embraces "commercial bribe receiving" as defined in Section 180.05 of the New York Penal Law. Section 180.05 provides as follows:

> "An employee, agent or fiduciary is guilty of commercial bribe receiving when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.

"Commercial bribe receiving is a class B misdemeanor."

Appellant contends that "commercial bribery" is not subsumed under "bribery" but is an offense of a different kind.

The district judges in this circuit have been sharply divided on this issue. See *United States v. Niedelman,* 356 F.Supp. 979, 981 (S.D.N.Y.1973) (Knapp, J.). The Fourth Circuit has rejected appellant's contention, *United States v. Pomponio,* 511 F.2d 953 (4 Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975), reversing Judge Bryan who agreed with Judge Knapp. We respectfully disagree with the Fourth Circuit.[3]

As the Supreme Court has noted, ["b]ribery has traditionally focused upon corrupt activities by public officials". *United States v. Nardello,* 393 U.S. 286, 293 n. 11, 89 S.Ct. 534, 538, 21 L.Ed.2d 487 (1969).[4] The traditional common law definition of bribery was limited to the "giving or receiving of anything of value in corrupt payment for an *official* act." *Bishop on Criminal Law* § 85(1), at 62 (9 ed. 1923) (emphasis added). "The term 'commercial bribery' is of relatively recent origin." Clark & Marshall, *A Treatise on the Law of Crimes* § 14.02, at 1037 (7 ed. 1968).[5] Since a purpose of the Travel Act was to lend aid to local law enforcement on a *national* basis, it is significant that in 1960, the year before the Travel Act was enacted, only thirteen states had commercial bribery statutes. Note, *Control of Nongovernmental Corruption by Criminal Legislation,* 108 U.Pa.L. Rev. 848, 864, 866 (1960) (chart).

The distinction between the traditional crime of bribery and the modern crime of commercial bribery is clear from the classification scheme of the New York Penal

---

**3.** We agree with Judge Albert V. Bryan who had arrested judgment in the *Pomponio* case and with Judge Whitman Knapp in *United States v. Niedelman, supra.* As our discussion will show, we draw from *United States v. Nardello,* 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), a conclusion different from the Fourth Circuit's.

**4.** In support of this statement, the Court cited 18 U.S.C. §§ 201–18, but stopped short of in-

cluding § 224, which punishes "bribery in sporting contests."

**5.** It is interesting to note that commercial bribery is listed by the Federal Trade Commission not as a crime but as an unfair trade practice. 16 C.F.R. § 225.14. Similarly, commercial bribery in the liquor industry is proscribed under the heading of "Unfair competition and unlawful practices." 27 U.S.C. § 205(c).

Law. The commercial bribery sections are found in Article 180 of the Penal Law, entitled "Bribery Not Involving Public Servants, and Related Offenses," while the sections dealing with bribery of public officials are in Article 200, entitled "Bribery Involving Public Servants and Related Offenses." The crime of "commercial bribe receiving," defined in § 180.05, is a Class B misdemeanor punishable by not more than three months' imprisonment, N.Y. Penal Law § 70.15(2), while the crime of "bribe receiving" by a public official, defined in § 200.10, is a Class D felony punishable by imprisonment of up to seven years. *Id.* § 70.-00(2)(d). Furthermore, the New York statute on commercial bribery, as it existed in 1961, did not even use the word "bribe," but employed the more precise words "gift or gratuity." N.Y. Penal Law § 439 (McKinney 1944).[6]

We must determine whether Congress intended to embrace commercial bribery within the scope of a statute which, as is clear from its legislative history,[7] was enacted for the purpose of punishing interstate travel in aid of racketeering enterprises engaged in by organized crime. As Mr. Justice Marshall stated for a unanimous Court in *Rewis v. United States,* 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), a case which gave a restrictive interpretation to the Travel Act, the "[l]egislative history of the Act is limited, but does reveal that § 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities located in another." 401 U.S. at 811, 91 S.Ct. at 1059.

The Court in *Rewis* cautioned that "an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and . . . would transform relatively minor

state offenses into federal felonies." 401 U.S. at 812, 91 S.Ct. at 1059. Later the same year, in *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971), the Court again stressed that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." The *Bass* Court also noted that "Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States," and that "the broad construction urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources." *Id.*

Guided by these principles, we said in *United States v. Archer,* 486 F.2d 670, 680 (2 Cir. 1973):

"While the precise holding of *Rewis* was that the proprietors of a Florida gambling establishment did not violate the Travel Act merely because some of their customers came from Georgia, a course of action foreseeable and even designed, the opinion indicates that the Act is not to be stretched to the limits of its language."

Judge Friendly, in *Archer,* after noting that the legislative history of the Travel Act indicated a primary concern with organized crime, observed that the Act "if read literally, would cover a $10 payment to fix a traffic ticket if only the person desiring the fix walked across a state line to pay off the policeman." 486 F.2d at 679.

The example given comes close to our case. Both the fixing of the ticket and the commercial bribe are, of course, morally reprehensible but they are violations of local law. As we have seen, the offense of "commercial bribe receiving" defined in

---

6. At least six states do not even now mention the word "bribery" in defining the offense now commonly called "commercial bribery." See Iowa Code Ann. § 741.1 (Supp.1976); Mass. Ann.Laws ch. 271, § 39 (1968); Nev.Rev.Stat. § 613.110 (1973); N.J.Stat.Ann. § 2A:170–88 (1971); N.C.Gen.Stat. § 14–353 (1969); Va. Code Ann. § 18.2–444 (1975).

7. See *Hearings on The Attorney General's Program To Curb Organized Crime and Racketeering Before the House Comm. on the Judiciary,* 87th Cong., 1st Sess. 11, 17 (1961) (remarks of Attorney General Robert F. Kennedy); *id.* at 108, 111, 113 (remarks of Assistant Attorney General Miller).

Section 180.05 of the New York Penal Law is a Class B misdemeanor with a maximum penalty of imprisonment for not more than three months. N.Y. Penal Law § 70.15(2).[8] If "commercial bribe receiving" is deemed to constitute "bribery" within the meaning of the Travel Act, the single element of interstate travel added to a local offense deemed by the New York Legislature to be a misdemeanor requiring imprisonment for three months as a maximum would become a federal felony punishable by up to five years. This is not to say that the conversion of a misdemeanor under New York law into a federal felony would violate due process, see *United States v. Brennan,* 394 F.2d 151, 153 (2 Cir.), *cert. denied,* 393 U.S. 839, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968), but we see no evidence of congressional intent to bring "commercial bribery" within the scope of the Travel Act.

■ It is true that the present New York statute uses the term "commercial *bribery.*" But *United States v. Nardello, supra,* teaches that the inquiry into whether the state violation committed by the defendant comes within the scope of the Travel Act depends not upon the nomenclature used, but upon the nature of the violation. The *Nardello* Court noted that the Travel Act was primarily designed to stem the clandestine flow of profits to organized crime, 393 U.S. at 292, 89 S.Ct. 534 and

gave "shakedown rackets" and "loan-sharking" as illustrations of methods used by organized crime to generate income. *Id.* at 295, 89 S.Ct. 534. To include "commercial bribery," which typically is not a feature of organized crime and was not subsumed under the traditional offense of bribery, in the coverage of the Travel Act, simply because it contains the word "bribery," would be to accept a literalism which the Court did not approve by its reasoning in *Nardello.*[9] As Judge Knapp said in *United States v. Niedelman, supra,* 356 F.Supp. at 981–82, "the extensive Congressional hearings cited by the Court in *Nardello . . .* contain not so much as a hint that so-called "commercial" bribery (as opposed to conventional bribery, arson and extortion) was ever considered to be a typical tool of the underworld. On the contrary, . . . commercial bribery is typically an establishment transgression."

■ Bearing in mind that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity," *Rewis v. United States, supra,* 401 U.S. at 812, 91 S.Ct. at 1059; see *United States v. Enmons,* 410 U.S. 396, 411, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), we hold that the Travel Act does not cover the crime of commercial bribery. Accordingly, we must reverse appellant's conviction on Counts Four and Six.[10]

---

**8.** When the Travel Act was enacted in 1961, the maximum penalty for commercial bribe receiving in New York was imprisonment for one year and a $500 fine. N.Y. Penal Law § 439 (McKinney 1944).

**9.** That the drafters of the Travel Act did not have in mind commercial bribery can be seen from a letter written by then Deputy Attorney General Byron R. White to the Chairman of the House Judiciary Committee. Criticizing a proposed House amendment to the Act which would eliminate from its coverage extortion and bribery not related to the specified crimes of gambling, liquor, narcotics or prostitution, he stated that the amendment "removes from the purview of the bill bribery *of state, local and federal officials* by the organized criminals unless we can prove that the bribery is directly attributable to gambling, liquor, narcotics or prostitution." Quoted in *United States v. Nardello, supra,* 393 U.S. at 292 n. 9, 89 S.Ct. at 537 (emphasis added).

**10.** Counts Four and Six charged that appellant violated the Travel Act by carrying out the unlawful activities of larceny by extortion and commercial bribery. We believe that the evidence was sufficient to establish that appellant committed the crime of larceny by extortion, as that crime is defined under New York law (N.Y. Penal Law § 155.05(2)(e)(ix) ). See, *e. g., People v. Dioguardi,* 8 N.Y.2d 260, 268, 203 N.Y.S.2d 870, 877, 168 N.E.2d 683, 688 (1960) ("It is well-settled law in this State that fear of *economic loss* or *harm* satisfies the ingredient of fear necessary to the crime."); cf. Part II *infra.* Since the crime denominated by New York as "larceny by extortion" is the very crime of "extortion" referred to in the Travel Act, the difference in nomenclature is without significance. See *United States v. Nardello, supra.* However, we construe appellant's motions at the close of the trial to include a request that the charge of violation of the Travel Act by means of commercial bribery be withdrawn from the jury's consideration. Thus,

## II.

We must, however, affirm the conviction under Count One charging a violation of the Hobbs Act, 18 U.S.C. § 1951. The Hobbs Act makes it a federal crime to interfere with interstate commerce by robbery or extortion. Extortion is defined to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

■ The government does not charge that the appellant used or threatened to use force or violence, or that he acted under color of official right. The charge is that he induced fear in his victim, *i. e.,* a fear of economic loss in that unless the victim paid $1,000 to the appellant, the victim would not be able to compete successfully for the subcontract. The difference between the commercial bribe taking charge and the unlawful activity of extortion is that only the latter involves initiative on the part of the defendant and coercion on the part of the victim. See *United States v. Hyde,* 448 F.2d 815, 833 (5 Cir. 1971).[11]

■ Since the main purpose of Congress in enacting the Hobbs Act was to combat labor racketeering, it is not surprising that most of the cases arising under the Hobbs Act involve the use by corrupt labor union officials of their power to order picketing or strikes to exact money from employers for their own benefit. See, *e. g., Hulahan v. United States,* 214 F.2d 441 (8 Cir.), *cert. denied,* 348 U.S. 856, 75 S.Ct. 81, 99 L.Ed. 675 (1954); *Bianchi v. United States,* 219 F.2d 182 (8 Cir.), *cert. denied,* 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249 (1955); *United States v. Dale,* 223 F.2d 181 (7 Cir. 1955); *United States v. Varlack,* 225 F.2d 665 (2 Cir. 1955); *United States v. Postma,* 242 F.2d 488 (2 Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957); *United States v. Tolub,* 309 F.2d 286 (2 Cir. 1962); *United States v. Kramer,* 355 F.2d 891 (7 Cir.), *vacated and remanded in part,* 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396 (1966); *United States v. Iozzi,* 420 F.2d 512 (4 Cir. 1970), *cert. denied,* 402 U.S. 943, 91 S.Ct. 1607, 29 L.Ed.2d 111 (1971).

Another line of Hobbs Act cases involves the use of power by public officials, from mayors to policemen, to shake down persons by refusing them the right to do business unless they pay tribute. See, *e. g., United States v. Sopher,* 362 F.2d 523 (7 Cir.), *cert. denied,* 385 U.S. 928, 87 S.Ct. 286, 17 L.Ed.2d 210 (1966); *United States v. Pranno,* 385 F.2d 387 (7 Cir. 1967), *cert. denied,* 390 U.S. 944, 88 S.Ct. 1028, 19 L.Ed.2d 1132 (1968); *United States v. Addonizio,* 451 F.2d 49 (3 Cir. 1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Kenny,* 462 F.2d 1205 (3 Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972); *United States v. DeMet,* 486 F.2d 816 (7 Cir. 1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974).

Other cases brought under the Hobbs Act involve not the extortion of money per se, but rather the classic racketeering activity of preventing "outside" businessmen from taking over accounts "belonging" to the extorters or their cohorts. See, *e. g., United States v. Tropiano,* 418 F.2d 1069 (2 Cir.

under the law in this circuit, *United States v. Mascuch,* 111 F.2d 602, 603 (2 Cir.), *cert. denied,* 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416 (1940); *United States v. Goldstein,* 168 F.2d 666, 671 (2 Cir. 1948), the error of the trial judge in instructing the jury on commercial bribery is preserved for appellate review. See *United States v. Natelli,* 527 F.2d 311, 328 (2 Cir. 1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). Since the jury may have convicted only on the commercial bribery specification, we must reverse the conviction on these counts. Of course, appellant may be retried on these counts for violating the Travel Act by committing the crime of larceny by extortion.

11. We recognize that the line between "solicitation" of a commercial bribe and extortion of a payment is thin, as is the line between bribery and extortion. Yet if the defendant purports to have the power to hurt the victim in economic terms and fear is induced, the solicitation becomes an extortionate demand.

1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1258, 25 L.Ed.2d 530 (1970); *United States v. Glasser,* 443 F.2d 994 (2 Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). The rights interfered with are held to be "property" within the meaning of the statute.

In each of the foregoing categories, the activities are the familiar tools of organized crime.

■ We have been cited by the government to no case under the Hobbs Act which is closely analogous to the case before us, involving a single incident of the use of economic fear by a private purchasing agent. Yet there is no limitation in the Hobbs Act definition of extortion which would exclude the activities of the appellant from its sweep, since the evidence showed that he obtained the $1,000 by the use of fear, attempting to convince the victim that he would be denied any chance to obtain a contract unless he paid.

The cases interpreting the Hobbs Act have repeatedly stressed that the element of "fear" required by the Act can be satisfied by putting the victim in fear of economic loss. See, *e. g., United States v. Addonizio, supra,* 451 F.2d at 72; *United States v. DeMet, supra,* 486 F.2d at 819.[12] Indeed the *Addonizio* case involved a situation quite similar to this one. The element

of "fear" was established in that case by proof of threats made by the defendants that certain bidders would not be awarded city contracts if they failed to pay the customary kickbacks to city officials.[13]

Since Congress has not limited the scope of extortion save for the statutory definition itself, we can formulate no judicial rule that would draw a practical line between one type of extortion that is covered by the Hobbs Act and another type which is not. Moreover, we cannot require, as an element of the offense, the presence of at least two individuals as evidencing the participation of organized crime, for the Hobbs Act definition of extortion is not limited to the crime of conspiracy to extort but deals with the substantive offense which can be committed by a single individual.

■ Thus, Judge Weinstein properly charged the jury that they could find the required element of fear if the evidence showed "a state of anxious concern, alarm, apprehension of anticipated harm to the business or a threatened loss to the business."

Accordingly, we affirm appellant's conviction on Count One.[14]

The conviction on Count One is affirmed; the conviction on Counts Four and Six are reversed.

12. This principle had long been established by cases interpreting the New York extortion statute. See, *e. g., People v. Dioguardi,* 8 N.Y.2d 260, 268, 203 N.Y.S.2d 870, 877, 168 N.E.2d 683, 688 (1960); *People v. Barondess,* 133 N.Y. 649, 31 N.E. 240, *rev'g mem. on dissenting opinion of Daniels, J., below* 61 Hun 571, 16 N.Y.S. 436 (1 Dep't 1891); *People v. Weinseimer,* 117 App.Div. 603, 613–15, 102 N.Y.S. 579, 586–88 (1 Dep't), *aff'd mem.,* 190 N.Y. 537, 83 N.E. 1129 (1907). The definition of extortion in the Hobbs Act was patterned on the New York statute. See *United States v. Nedley,* 255 F.2d 350, 355 (3 Cir. 1958); *United States v. Sweeney,* 262 F.2d 272, 275 n. 3 (3 Cir. 1959).

13. Since the *Addonizio* case involved extortion committed by public officials, the case could have been prosecuted on the theory that defendants extorted money "under color of official right." Indeed, the indictment originally charged the defendants with taking property both by use of fear of financial injury and under color of official right. But the case was submitted to the jury only on the "fear of financial injury" theory. 451 F.2d at 63 n. 14. Thus, we consider *Addonizio* to be on all fours with this case.

14. Whether it is desirable to bring such cases in the federal courts is a matter on which U.S. Attorneys should exercise careful judgment.