UNITED STATES of America, Plaintiff,

v.

Sten THORDARSON, Martin Fry, Craig Dunbar, Martin Salgado, and Charles Wise, Defendants.

No. CR 79–946–RMT.

United States District Court, C. D. California, Criminal Division.

March 17, 1980.

Andrea Sheridan Ordin, U.S. Atty., Rodney M. Perlman, Charles C. Wehner, Sp. Attys., U.S. Dept. of Justice, Los Angeles, Cal., for plaintiff.

W. Michael Mayock, Los Angeles, Cal., for defendant Thordarson.

Jan L. Handzlik, Los Angeles, Cal., for defendant Fry.

Brown & Newton, Beverly Hills, Cal., for defendant Dunbar.

John Resich, San Pedro, Cal., for defendant Salgado.

Terry W. Bird, Beverly Hills, Cal., for defendant Wise.

## OPINION

TAKASUGI, District Judge.

### I.

### FACTUAL BACKGROUND.

In 1978, Teamsters Locals 186 and 389 ("Local") attempted to organize employees of Redman Moving and Storage Company ("Redman") located in Thousand Oaks, California. After being elected as the bargaining agent for Redman employees in July of 1978, Local 186 ordered a strike against Redman. Since Local 186 did not, by itself, have the requisite manpower to conduct the strike, it obtained the assistance of Local 389. Between July and December of 1978, Redman's truck fleet was the object of vandalism, including tire slashings and truck burnings.

In November of 1979, after a fourteen-month investigation, Sten Thordarson, Craig Dunbar and Charles Wise, secretary-treasurer, business agent and vice-president, respectively, of Local 389, and Martin Fry and Martin Salgado, secretary-treasurer and trustee, respectively, of Local 186, were indicted on ten counts for violations of 18 U.S.C. §§ 1952, 844(i), and 1962(d) and 29 U.S.C. § 501(c) in connection with the burning of two Redman trucks in Arizona and Connecticut. The defendants have moved to dismiss the entire indictment.

### II.

### COUNTS 4 AND 5 OF THE INDICTMENT, BROUGHT UNDER 18 U.S. C. § 1952, ARE DISMISSED.

■ Defendants move to dismiss Counts 4 and 5 of the indictment charging them with violations of 18 U.S.C. § 1952,[1] relying on the Supreme Court's ruling in *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). The defendants in *Enmons* were charged with using threats of force and violence during a strike action to obtain higher wages and benefits for union members, in violation of the Hobbs Act, 18 U.S.C. § 1951.[2] The defendants allegedly blew up a transformer substation, fired high powered rifles at three company transformers, and drained oil from a company transformer. The court held that the alleged acts did not amount to a "wrongful taking" necessary for a § 1951 extortion violation because violence was used to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks. *Enmons*, 410 U.S. at 400, 93 S.Ct. at 1009.

The government's major attempt to distinguish *Enmons* from the case at bar is its insistence upon limiting that case to merely an interpretation of the term "extortion" in § 1951. Because § 1952 does not contain the "wrongful taking" element of § 1951, it is argued, *Enmons* is inapplicable to a § 1952 prosecution.

However, after a careful reading of *Enmons* and its progeny, it is inaccurate to so

1. 18 U.S.C. § 1952 provides in pertinent part that:
   (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign Commerce, including the mail, with intent to . . .
   (2) commit any crime of violence to further any unlawful activity; or
   (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
   and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined . . . or imprisoned . . . or both.

   (b) As used in this section, "unlawful activity" means . . . (2) extortion, bribery or arson in violation of the laws of the State in which committed or of the United States.

2. 18 U.S.C. § 1951 provides in pertinent part:
   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined . . . or imprisoned . . . or both.

narrowly limit the case. The ruling in *Enmons* was based upon the underlying purpose of § 1951 which was to deal with, *inter alia*, labor racketeering activities.

In reviewing the language and legislative history of the Hobbs Act, the court found no congressional intent to extend federal criminal jurisdiction to include violent acts done in pursuit of legitimate union objectives or to put the federal government in the business of policing the orderly conduct of strikes. *Enmons*, 410 U.S. at 408–12, 93 S.Ct. at 1014–16. In fact, the issue upon which *certiorari* was granted in *Enmons*, was not whether violent activity during strikes may constitute extortion under § 1951, but whether § 1951 "proscribes violence during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective-bargaining demands." *Enmons*, 410 U.S. at 399, 93 S.Ct. at 1009. The court concluded that the state court was the proper forum for such a prosecution.[3]

The court further concluded that even if the language and history of the Hobbs Act were less clear, a § 1951 prosecution would have been improper for two related reasons. First, criminal statutes must be strictly construed, with any ambiguity being resolved in favor of lenity. *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). Second, unless Congress clearly conveys its purpose, the court will not assume "a significant change in the sensitive relation between federal and state criminal jurisdiction. *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)." *Enmons*, 410 U.S. at 411–412, 93 S.Ct. at 1015–1016.

Clearly, a labor official, merely by virtue of his position, is not exempt from all federal prosecution. Labor officials have been federally prosecuted for abusing their power to order picketing or strikes for the purpose of extracting money for their personal benefit. *United States v. Daley*, 564 F.2d 645 (2d Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978); *United States v. Quinn*, 514 F.2d 1250 (5th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976). Federal criminal prosecution is also not precluded where violence is used in an attempt to force an employer to pay for work which the worker had no intention of performing. *United States v. Kemble*, 198 F.2d 889 (3d Cir.), *cert. denied*, 344 U.S. 893, 73 S.Ct. 211, 97 L.Ed. 690 (1952). Such labor racketeering is precisely the activity which § 1951 was intended to curb. However, § 1951 is inapplicable to "violence employed during the course of a valid, bona fide collective bargaining negotiation for better working hours, wages and conditions." *United States v. Caldes*, 457 F.2d 74, 77 (9th Cir. 1972).

Rather than limiting the *Enmons* ruling to extortion cases, subsequent courts have consistently recognized that the case was explicitly tied to the labor context. Short of express congressional intent, "the effect of *Enmons* was to remove from the reach of federal criminal law the use of coercive tactics to obtain increased wages . . . when the payment is gained in furtherance of legitimate objectives." *United States v. Quinn*, 514 F.2d 1250, 1257 (5th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976). *See also*, *United States v. Cerilli*, 603 F.2d 415, 419–20 (3d Cir. 1979). Thus, if *Enmons* is to be narrowly construed at all, it is only done so within the context of legitimate labor activity. *United States v. Culbert*, 435 U.S. 371, 376–78, 98 S.Ct. 1112, 1115–16, 55 L.Ed.2d 349 (1978); *United States v. Warledo*, 557 F.2d 721 (10th Cir. 1977); *United States v. Jacobs*, 543 F.2d 18 (7th Cir. 1976), *cert. denied*, 431 U.S. 929, 97 S.Ct. 2632, 53 L.Ed.2d 244 (1977).

The courts have similarly delimited the reach of the Travel Act, 18 U.S.C. § 1952. Several courts have stated that the primary purposes of § 1952 are to attack organized crime and to aid local authorities in combatting it. *United States v. Polizzi*, 500 F.2d

---

3. The court stated that "acts of violence occurring during a lawful strike and resulting in damages to persons or property are undoubtedly punishable under State law. To punish persons for such acts of violence was not the purpose of the Hobbs Act." *Enmons*, 410 U.S. at 398, 93 S.Ct. at 1009.

856 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). An extensive analysis of the legislative history of § 1952 is found in *United States v. Roselli*, 432 F.2d 879 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). The Ninth Circuit stated that, "it is quite clear that in enacting § 1952, Congress was not concerned with regulating interstate travel or the use of interstate facilities, but rather with directly suppressing unlawful local activities from which organized crime drew its sustenance." *Roselli*, 432 F.2d at 891; *United States v. Colacurcio*, 499 F.2d 1401, 1406 (9th Cir. 1974).

The Supreme Court in *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), stated that:

> [The] legislative history of the [Travel] Act is limited, but does reveal that § 1952 was aimed primarily at organized crime and, more specifically, at persons who reside in one State while operating or managing illegal activities in another. . . . [A]n expansive [interpretation of the] Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources and . . . would transform relatively minor state offenses into federal felonies.

*Rewis*, 401 U.S. at 811–812, 91 S.Ct. at 1059.

*Rewis*[4] was followed in *United States v. Brecht*, 540 F.2d 45 (2d Cir. 1976), *cert.*

*denied*, 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977), in which § 1952 was not extended to acts of commercial bribery, even though bribery was a § 1952 offense. "The inquiry into whether the state violation committed by the defendant comes within the scope of the Travel Act depends not upon the nomenclature used but upon the nature of the violation." *Brecht*, 540 F.2d at 50. The court observed that § 1952 was primarily intended to counter methods used by organized crime to generate income, such as "shakedowns" or "loan-sharking." *United States v. Nardello*, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). Citing *Enmons* as to the rule of lenity, the *Brecht* court refused to consider commercial bribery within the ambit of § 1952.

The *Enmons* rationale is as appropriate to a § 1952 prosecution as it is to a § 1951 prosecution.[5] Defendants, in the case at bar, are labor officials whose unions participated in a lawful strike. Their alleged acts are ones contemplated as part of a series of coercive tactics to achieve the recognition of a union contract. Although, as in *Enmons*, the statutory proscriptions arguably apply,[6] there is no indication that Congress intended to extend the scope of a statute aimed at combatting organized criminal activity to encompass violence arising out of a lawful strike. Criminal statutes must be strictly construed, and any ambiguity resolved in favor of lenity. *Enmons*, 410 U.S. at 411, 93 S.Ct. at 1015. Much more explicit

---

**4.** The court in *Rewis* refused to extend § 1952 to the interstate travel by mere customers of a gambling establishment.

**5.** The government argues that the defendants' attempt to make an exception to § 1952 is analogous to the one attempted in *United States v. Erlenbaugh*, 409 U.S. 239, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). *Erlenbaugh*, however, hardly stands for the proposition advocated by the government. The court merely recognized that §§ 1952 and 1953 were both parts of the same legislative effort to assist local authorities in dealing with organized criminal activity, playing different roles in achieving the common goal. *Erlenbaugh* cannot possibly be construed as extending the scope of § 1952 beyond organized criminal activity and into the field of legitimate labor activity.

**6.** The government further attempts to distinguish *Enmons* on the basis that the cases do not preclude federal prosecution for violation of specific federal statutes. The government argues that because §§ 1952 and 844(i) (discussed, *infra*) apply to "any person" or to "whoever" commits the unlawful act, the statutes clearly include the alleged conduct of the defendants and are not limited to exclude certain classes of people, such as labor officials who perform unlawful acts to further union objectives. This argument is without merit. § 1951, considered in *Enmons*, also applies to "whoever" performs the unlawful acts. The court, nevertheless, held that the congressional intent explicitly did not extend the statute to violent activity stemming from a lawful strike.

statutory language is required "to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes." *Id.*

The indictment is an attempt to circumvent the *Enmons* proscription similar to the one rejected by the Second Circuit in *United States v. DeLaurentis*, 491 F.2d 208 (2d Cir. 1974). In *DeLaurentis*, the government attempted to invoke a civil rights statute to gain federal jurisdiction over violent activity which had occurred during a lawful labor dispute. The court found that explicit provisions of the National Labor Relations Act, and not the civil rights statute, controlled regulation of the alleged acts. Relying on *Enmons*, the court concluded that "the Government has unjustifiably used federal law to convert an unfair labor practice into a criminal conspiracy." *DeLaurentis*, 491 F.2d at 214. *See, United States v. Bailes*, 120 F.Supp. 614, 637 (S.D.W.Va.1954).

Acts of violence, such as the ones alleged in the instant case, occurring during a lawful labor dispute and resulting in damage to persons or property are punishable under state law. However, there is nothing in the language or history of § 1952 to "justify the conclusion that Congress intended [§ 1952] to work such an extraordinary change in Federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States." *Enmons*, 410 U.S. at 411, 93 S.Ct. at 1015. Therefore, Counts 4 and 5 charging violations of 18 U.S.C. § 1952 are dismissed.

**7.** 18 U.S.C. § 844(i) provides that:

Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned . . . or fined . . . or both.

**8.** The legislative history of § 844 is unclear. There is some indication that it may have been included in the Organized Crime Control Act in response to the bombings of buildings on college campuses during the late 1960's. 1970 *U.S. Code Cong. & Admin. News* at 4007, 4075, 4090. § 844, however, was part of the overall

### III.

### COUNTS 2 AND 3 OF THE INDICTMENT, BROUGHT UNDER 18 U.S.C. § 844(i), ARE DISMISSED.

Defendants Fry and Salgado are charged with violations of 18 U.S.C. § 844(i).[7] As discussed, *supra*, absent specific authorization from Congress, *United States v. Enmons, supra*, precludes federal criminal prosecution for violent activity which occurs during the course of a legitimate labor dispute. §844(i), enacted as part of the Organized Crime Control Act of 1970 (P.L. 91–452), does not provide such authorization.[8]

Although the application of § 844 may not be limited solely to organized crime, there is clearly no indication of any intent by the Congress to extend federal criminal prosecution into the labor field. In fact, any such congressional intent is even less apparent in § 844 than in the Hobbs Act which was considered in the *Enmons* case, *supra*.[9] Thus, a consistent application of the *Enmons* doctrine is appropriate to a § 844 prosecution. Accordingly, Counts 2 and 3 charging violations of 18 U.S.C. § 844(i) are dismissed.

### IV.

### COUNTS 6 THROUGH 10 OF THE INDICTMENT, BROUGHT UNDER 29 U.S.C. § 501(c), ARE DISMISSED.

Defendants are also alleged to have violated 29 U.S.C. § 501(c)[10] by authorizing

congressional attempt to combat organized crime. In fact, included in the Act was 18 U.S.C. § 1962, under which defendants are also charged. *See* discussion, *infra*.

**9.** The Hobbs Act, 18 U.S.C. § 1951, was directed at labor racketeering activities. *United States v. Daley*, 564 F.2d 645 (2d Cir. 1977), *cert. denied*, 435 U.S. 933, 98 S.Ct. 1508, 55 L.Ed.2d 530 (1978). There is no indication that Congress intended § 844 to be concerned with legitimate labor activity.

**10.** 29 U.S.C. § 501(c) provides that:

Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the

and using union funds to pay for travel, telephone, and unspecified expenses incurred in trips to Arizona and Connecticut for the unlawful purpose of locating and destroying two Redman trucks. The government's theory is that a violation of § 501(c) is established when the union official utilizes union funds for an unlawful purpose, regardless of the existence of any arguable union benefit.

The leading case is *United States v. Silverman*, 430 F.2d 106 (2d Cir. 1970), *cert. denied*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). The defendant was indicted for embezzlement in violation of § 501(c) and charged in Counts 1 through 8 with diverting union funds for the payment of printing expenses incurred in the campaign of Abraham Beame for mayor of New York under the guise of a payment for union stationery and in Counts 10 through 13, for receiving four checks from the union under the pretense of a steward's committee expense. Judge Moore wrote the majority opinion involving Counts 10 through 13 and dissented from Judge Friendly's opinion involving Counts 1 through 8.

The court noted initially that the purpose of § 501(c) was to hold union officials strictly responsible as fiduciaries for the union funds entrusted to them and, therefore, to require them to expend those funds only in accordance with the union's constitution, by-laws, and resolutions. The two judges differed, however, as to the standards for a § 501(c) conviction.

Judge Moore stated that because the political contributions in Counts 1 through 8 were not *per se* illegal, it was necessary to focus on the issue of whether the contributions were properly authorized and made for the union's benefit. If there is no possible union benefit from the use of the funds (e. g., personal nonbusiness expenses not incurred in furtherance of union business, *United States v. Dibrizzi*, 393 F.2d 642 (2d Cir. 1968), it makes no difference whether the use was authorized. Judge Moore held

that a conviction under § 501(c) may be obtained by demonstrating a fraudulent intent to deprive the union of its funds and either a lack of authorization *or* an absence of benefit to the union. Believing that there was sufficient evidence for the jury to find that the contributions were either for the private benefit of the defendant or made only with a sham or invalid authorization from the union, Judge Moore voted to affirm the convictions in Counts 1 through 8.

However, the majority opinion by Judge Friendly observed that § 501(c) is essentially a larceny-type offense which amounts to the taking of another person's property or causing it to be taken, knowing that the other person would not have wanted that to be done. The "unlawful and wilful" element of the offense requires that the funds be used for the converter's personal benefit (or for the personal benefit of another) and not for the benefit of the union. Judge Friendly stated that assuming, *arguendo*, that Judge Moore's standard was adopted, the union did benefit from the political contributions and, in view of the fact that the union's constitution contemplated political contributions, there was no fraudulent intent to deprive the union of its funds nor lack of bona fide authorization.

Finally, the payments in Counts 10 through 13 were clearly for the personal benefit of the defendant. The entire court upheld the conviction on these counts because there was sufficient evidence for the jury to conclude that there was no proper authorization for the payments.

As explained in *United States v. Goad*, 490 F.2d 1158 (8th Cir.), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665 (1974), *Silverman, supra*, may be analyzed as applying different standards for authorized and unauthorized expenditures. Because Judge Moore's opinion dealt with the unauthorized uses, the elements in a § 501(c) conviction for such uses can be characterized as requiring (1) a fraudulent

moneys, funds, securities, property, or other assets of a labor organization of which he is an officer or by which he is employed, direct-

ly or indirectly, shall be fined . . . or imprisoned . . . or both.

intent to deprive the union of its funds, and (2) a lack of authorization according to the union's constitution and by-laws. On the other hand, Judge Friendly's opinion adopted Judge Moore's standard *arguendo* concerning the authorized uses. Under those circumstances, the standard required is (1) a fraudulent intent to deprive the union of its funds, and, (2) an absence of benefit to the union.[11]

The government relies primarily on *United States v. Boyle*, 482 F.2d 755 (D.C.Cir.), *cert. denied*, 414 U.S. 1076, 94 S.Ct. 593, 38 L.Ed.2d 483 (1973). In *Boyle*, the defendant converted union funds into campaign contributions in direct violation of 18 U.S.C. § 610 [making it unlawful for any labor organization to contribute to a federal political campaign]. The court distinguished *Silverman* on the grounds that in that case there was no legal bar to the use of the funds *if* the transfer was properly authorized by the union. But in *Boyle*, the use to which the money was converted was itself unlawful and, therefore, not even an authorization could have made the contribution legal.

The court further rejected defendant's claim that the jury must find that the union official knew at the time that the expenditure was illegal or *ultra vires*:

> As we have noted, however, the transfer in this case was not for a purpose that was *ultra vires*, but rather for a purpose that was itself a crime. There is no hint in either the statute or its legislative history that indicates a Congressional intent to excuse from the ambit of § 501(c), transfers for a criminal purpose. No officer or union governing body could in all logic believe that a transfer for a criminal purpose was for legitimate union purpose, was authorized by the union consti-

tution or by-laws, or was for the union's benefit.

*Boyle*, at 765.

The government interprets *Boyle* as establishing a § 501(c) violation whenever the funds are utilized for an "unlawful purpose." However, the government's interpretation is overly broad. Specifically, the use of this "broad" interpretation in the context of labor organizational activities and strikes is troubling. Taken to its logical conclusion, the government's theory would consider as an embezzlement indictable under § 501(c), any union expenditures made to reimburse members or other individuals who ultimately violate certain state laws through acts that might reasonably occur during the labor dispute, such as disturbance of the peace, assault, or vandalism. For example, unions often hire professional picketers. If these picketers participate in "unlawful activities" that occur during legitimate labor activities, the union officials who authorized the expenditure for the hiring of the picketers could conceivably be prosecuted under § 501(c). If a union officer reimbursed organizers for gasoline, hotel and other expenses, and these organizers participated in the identical activities as did the union workers in *Enmons, supra*, (blowing up a transformer substation, firing high-powered rifles at three company transformers, and draining the oil from a company transformer) there would exist the anomalous situation wherein the federal government would be precluded from indicting the union officials who commit violent acts in pursuit of legitimate labor objectives, but would be able to convict the union officials on the basis that any funds expended toward those legitimate labor objectives would constitute a § 501(c) embezzlement.

---

11. *See United States v. Bane*, 583 F.2d 832 (6th Cir. 1978) *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979), where the court stated that in a § 501(c) case in which the expenditure of union funds was authorized, the government must prove a fraudulent intent to deprive the union of its funds and a bad faith belief that the expenditure was for the legiti-

mate benefit of the union. The government, however, need not prove that the expenditure did not actually benefit the union. *See also United States v. Santiago*, 528 F.2d 1130 (2d Cir.), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976), where the same standard was used.

Although *Boyle, supra,* is persuasive, it is not binding on this court. *Boyle* can, however, be distinguished because the "use" to which the funds were converted was *per se* illegal. In the case at bar, reimbursement for expenses incurred for union benefit are not *per se* illegal. As indicated above, *Boyle* is overly broad and involved special circumstances that were not necessarily applicable to the *Silverman* standard.[12]

The *Silverman* standard is the appropriate standard to apply to the facts of this case. The constitutions of both unions contain provisions authorizing reimbursements for expenses incurred while performing union business.[13] The secretary-treasurers of both unions have the authority to reimburse union organizers for expenses incurred for out-of-town trips pursuant to activities that are of benefit to the union. As such, these expenses can reasonably be considered as authorized.

The factors to consider in determining whether authorized expenditures are viola-

tions of § 501(c) are the fraudulent intent of the defendant and his good faith belief that the funds were expended for the union's benefit. It is unlikely that there was a fraudulent intent to deprive the union of its funds because reimbursement for the expenses incurred in labor organizing, and particularly strike-oriented activities, are probably not for acts "that the union would not have wanted . . . done." *United States v. Ottley,* 509 F.2d 667 (2d Cir. 1975); *United States v. Silverman,* 430 F.2d 106 (2d Cir. 1970), cert. denied, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971); *United States v. Hart,* 417 F.Supp. 1314, 1322 (S.D. Iowa 1976). Further, the government concedes that it has no evidence that union funds were used for the defendants' personal benefit. Finally, it is clear from *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), that violent means, even if in violation of state law, used to achieve legitimate labor objectives, are for the union's benefit. Accordingly,

---

12. The logical extension of the *Boyle* argument is that the ultimate use is a violation of § 501(c) itself (which is an unlawful act) thereby allowing some creative prosecutor to bootstrap an alleged § 501(c) violation as being the unlawful act necessary to impose the *Boyle* standard. To avoid the circular possibilities of *Boyle,* the focus as to the ultimate unlawfulness should be on the wrongful conversion. Accordingly, the standard that should be adopted is one that concentrates on the authorization for the expenditure and the fraudulent intent of the alleged converter, rather than on the "use."

13. Local 389's constitution provides:
The Secretary-Treasurer shall have the authority to disburse or order the disbursement of all monies necessary to pay the bills, obligations and indebtedness of the Local Union, which have been properly incurred as provided herein. He shall have the authority to pay current operating expenses of the Local Union, including rents, utilities and maintenance of the union hall, and salaries and expenses of officers and employees as authorized by the Executive Board.
—Article IX, H
He shall have general charge and supervision of all the officers and employees. . . .
—Article IX, I
Recognizing that the officers and representatives of this organization do not work regularly scheduled hours and receive no compensation for overtime or premium pay; also recognizing that such individuals are re-

quired to pay varying amounts for lodgings and meals depending upon the city to which they travel, which amounts are sometimes less, but more often more than the allowance given them, . . . ; that such activities benefit the organization and its members, that the time spent in such activities is unpredictable and unascertainable, such officers and representatives may be granted an allowance (both for in-town and out-of-town work, respectively, which in the case of out-of-town work shall include hotel and meal expenditures) in which amount (daily, weekly, or monthly) as the Local Executive Board may determine and there shall be no need to make a daily or other accounting to the local union membership for such allowances. In addition to the allowances set forth above, all officers and employees may be reimbursed for, or credit provided for, all other expenses incurred in connection with their activities.
—Article XV, A
When a representative of the organization is engaged in activities in the intent of or for the benefit of the organization and its members, the labor organization shall pay the expenses incurred therein, or reimburse the representative upon receipt of itemized vouchers from him or the suppliers of such services.
—Article XV, B
Local 189 has similar provisions (Articles X and XV) in its constitution.

Counts 6 through 10 charging violations of 29 U.S.C. § 501(c) are dismissed.

## V.

## COUNT 1 OF THE INDICTMENT, BASED ON 18 U.S.C. § 1962(d), IS DISMISSED.

█ The § 1962(d) [14] [the RICO Statute] count shall be dismissed for two reasons. First, the *Enmons* doctrine, *supra*, is equally applicable to RICO. The Ninth Circuit in *United States v. Marubeni America Corp.*, 611 F.2d 763 (9th Cir. 1980) reviewed the legislative history of the statute and stated:

> We believe that anyone who reads the legislative history must be struck by the single-mindedness with which Congress drafted RICO. Congress declared over and over again that its purpose was to rid legitimate organizations of the influence of organized crime. This purpose must be the linchpin of any construction of RICO.

*See*, p. 769 n.11.

Clearly, RICO's jurisdiction does not extend to violent activities occurring during strikes.

Second, defendants have not engaged in any activities which constitute "labor racketeering." Furthermore, the means by which the government attempts to invoke § 1962—violations of 18 U.S.C. §§ 1952 and 844(i) and 29 U.S.C. § 501(c)—have all been disposed of.

Therefore, Count 1 charging a violation of 18 U.S.C. § 1962(d) is also dismissed.

---

14. 18 U.S.C. § 1962(c) provides in pertinent part that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(d) provides that:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.