Froessel, J.
The Appellate Division has reversed defendants ’ convictions for extortion and conspiracy to commit extortion, dismissed the indictment and discharged them from custody. In addition to the conspiracy count, the indictment charged defendants with extorting $4,700 from the officers of two corporations. Said corporations were nonunion, conducted a whole *263 sale stationery and office supply business in Manhattan, did an annual business of several million dollars, and their stock was wholly owned by a family named Kerin. Anthony Kerin, Sr., president and “boss” of the Kerin companies, made all the important corporate policy decisions. The other two corporate officers were his son, Kerin, Jr., and one Jack Schumann.
Defendant McNamara, the alleged “front man” in the extorsive scheme, was an official of Teamster Locals 295 and 808, as well as a member of the Teamsters Joint Council. Defendant Dioguardi, the immediate beneficiary of the payments and the alleged power behind the scene, was sole officer of Equitable Research Associates, Inc.— a, publishing house, according to its certificate of incorporation, a public relations concern, according to its bank account and the Yellow Pages of the telephone directory, a labor statistics concern, according to its office secretary and sole employee, and a firm of labor consultants, according to its business card and alternate listing in the aforesaid directory.
The ‘' question of law ’ ’ before us is “ whether, from any view of the testimony, there was a question of fact regarding the defendant [s’] guilt which should have been submitted * * * to the jury and not disposed of by dismissal in the appellate court.” (People v. Bellows, 281 N. Y. 67, 73.) The facts may be summarized as follows:
Between November, 1955 and mid-January, 1956, the Kerin companies were confronted with organizational activities on the part of four unions. A CIO local first contacted management by letter. Two visiting representatives from Teamster Local 210 then threatened to organize the companies by ' ' putting-pickets out” and “stopping shipments” if management did not agree to organize the employees on behalf of their local. Some six weeks later a picket appeared at the delivery and shipping entrance in the rear of the Kerin premises, carrying a placard reciting that one of the Kerin companies was unfair to members of Teamster Local 138. No representative from that local ever contacted management, and all its officials testified that they had not authorized a picket line at the premises.
Finally, during the week in which the picket was parading at the rear, two organizers from Local 1601 of the Retail *264 Clerks International Association appeared in the front lobby distributing literature to the companies’ employees. This last union had been recommended to management by another stationery concern, and had been sought out by Kerin, Sr., who wished to have his employees organized by a strong, competent, ethical union. Although the president of that local had promised to promptly send representatives to canvass the employees, nothing happened for three weeks, and the belated appearance of Local 1601 organizers only compounded the confusion in the minds of the Kerin officers, further complicating an already complex labor situation.
The appearance of the picket line—which truck drivers from two companies refused to cross — thoroughly alarmed the Kerin officers, since they were in an “ extremely competitive business ’ ’, and a cessation of incoming or outgoing truck deliveries for as short a period as two weeks would effectively force them out of business. Their attorney, William Coogan, advised them that filing a petition with the National Labor Relations Board (N. L. R. B.) for an election among the competing unions would not constitute a solution, since such proceeding might take anywhere from two weeks to three months, and peaceful picketing could not be enjoined before, during or even after the election. He felt that a consent election was the best way to settle the matter, and informed them that he might be able to meet with a prominent teamster official on a higher level, who could call a halt to the “ ridiculous ” situation of two teamster locals competing with each other.
Coogan had previously been in touch with his brother-in-law, William White, a labor law professor who had met McNamara socially and, after the Kerin management agreed, White contacted McNamara and arranged a meeting with him and Coogan. At the meeting, McNamara was generally discouraging as to the feasibility of a consent election. However, after joining Coogan in a men’s room, McNamara suggested privately “ that something might be done, but that it would be expensive * * * it could run five to ten thousand dollars ”. After Coogan vetoed that possibility, and McNamara had made several telephone calls, the three adjourned to a Chinese restaurant recommended by McNamara for dinner, during the course of which one Milton Holt approached the table and was introduced by *265 McNamara as an attorney, although, in fact, he was an officer of Teamster Local 805 and not a member of the Bar. After Holt was apprised of the labor difficulties confronting the Kerin companies, McNamara stated: “ This looks to me to be the kind of a situation which Equitable can help out ’ ’, to which Holt nodded an affirmative. Neither White nor Coogan had ever heard of Equitable before that day, and they neither sought nor received enlightenment.
The following morning Coogan reported to the Kerin officers that he had had “ a very rough evening” with McNamara — whom he described as a “tough-talking man” who “was obviously a high official in the labor movement ”, “ had a grasp of the whole situation” and “knew what was going on”— and that ‘ the gist of the conversation was that * * * for a payment of ten thousand dollars, the whole matter could be settled, and settled almost immediately ”. Kerin, Sr., “ almost had a stroke ” and furiously asserted that he would rather close up his business than “ pay ten thousand dollars, or any amount of money, to anybody ”. According to Kerin, Jr., his father inquired: “ What happens if we don’t pay? ”, to which Coogan replied that “ orders could be given through the Teamsters Joint Council to this area to make the picket line completely effective; that it would block off almost one hundred per cent all deliveries and all receiving”. Coogan further stated that they could explore the situation further if they desired, but that his firm would have no future discussions of any kind with McNamara.
After waiting for his father to “ cool off ”, Kerin, Jr., and Schumann told him that he owed it to them and the employees at least to discuss the situation with McNamara. Kerin, Sr., finally agreed to such a meeting, but then did nothing about it. Two days later, McNamara first telephoned White and then Coogan to inquire of each whether Coogan’s client was “ interested ” in pursuing their discussion of the other evening. He gave Coogan two telephone numbers at which he could be reached, one of which was the office number of Equitable. After Coogan furnished Schumann with the numbers, the latter called McNamara and arranged a meeting for the following day at the Manhattan Club.
*266 On Friday afternoon, January 20, 1956, McNamara, accompanied by Holt—whom he again introduced as his attorney — met with the three Kerin officers in a private diningroom at the Manhattan Club. Holt soon suggested that Kerin, Sr., and McNamara “step outside and have a chat” and, after adjourning to another room, McNamara assured Kerin, Sr., that his troubles could be ended, and would be, if he did three things: (1) “ joined up ” with McNamara’s Local 295, (2) paid $3,500 to Equitable to defray the “out-of-pocket” expenses incurred by the various unions that had sought to organize the companies, and (3) retained Equitable as labor consultant at $100 per month for each company for the period of the collective bargaining contract to be signed with Local 295, for which the companies ‘ ‘ would get counsel and advice * * * in any matter that was pertinent or related to labor or labor relationships ’ ’. McNamara repeatedly assured Kerin, Sr., that the picketing would stop immediately and the companies would be guaranteed labor peace if his program were accepted.
Kerin, Sr., stated that he was not averse to having his employees organized by Local 295, if it was a good, honest union, and that he could ‘' accept the idea of a hundred dollars a month as a retainer fee for labor counsel and advice ”. He protested against the proposed payment of $3,500, however, as an “extraordinary charge” that sounded “like a hold-up”, to which McNamara replied: “ ‘ It may seem that way to you, Mr. Kerin, but that is the amount of money that these unions that have sought to organize you * * * have expended, and if we are going to avoid further trouble and further difficulties, it is my suggestion that you pay that to the Equitable Associates. If you don’t pay it, we can’t go through with the program.’ That was either said or implied, * * * I better withdraw that. That was the point.” (Emphasis supplied.) Kerin, Sr., finally agreed, after insisting upon a written contract with Equitable and payment by check. Upon returning to the rest of the group, he advised his son and Schumann of the terms of McNamara’s program. He emphasized that the payments to Equitable were necessary “ in order to get rid of [the] picket ”, who “was going to be removed immediately”, and that McNamara had assured him “ that our troubles and difficulties would be at an end ” and that “ we would be guaranteed labor *267 peace for the term of our contract Kerin, Jr., and Schumann assented to the program.
On the Monday following the meeting, no picket or organizer appeared at the Kerin premises. McNamara came to the office in the morning, stating: “ Well, you notice that you have no more picket ’ ’, and delivered two letter agreements between Equitable and the Kerin companies, signed by defendant Dioguardi— this being the first time his name came to the attention of the Kerin management. The contracts authorized Equitable to negotiate with Local 296 on behalf of the employers, and the employers agreed to pay $3,500 upon execution of the agreements, and $200 a month thereafter ‘ ‘ for such services rendered by you, or to be rendered, irrespective of the final negotiations of any written agreement ”, and for general counseling services. The agreements did not state that the down payment of $3,500 was to be used to defray the expenses supposedly incurred by the various unions that had sought to organize the Kerin companies. Although McNamara agreed to leave the contracts with the Kerin officers for their perusal, he insisted on immediate receipt of $3,500, and checks in that amount were handed over to him.
Revised contracts were delivered to McNamara about a week later, and he returned them signed by Dioguardi. The Kerin checks for $3,500 were deposited in Equitable’s bank account, and within nine days thereafter practically the entire amount was withdrawn. The bulk of the checks was payable to, signed and indorsed by Dioguardi—not to other unions for reimbursement of their expenses — and was entered on Equitable’s books as salary payments to him.
In May, 1956, over three months after the monthly payments to Equitable had commenced, McNamara arranged an appointment for Schumann with Dioguardi, at the request of the Kerin management. After Schumann commented on the removal of the picket and the absence of labor trouble, Dioguardi “ said, in substance, that that is the way it should be”, and asked Schumann to send him a copy of the contract to be signed with Local 295. In June, after the Kerin management had successfully induced their employees to join Local 295 so as to forestall picketing and keep the companies operating, a collective bargaining agreement with McNamara’s local was signed. Although *268 a copy of .the contract was mailed to Equitable, as requested by Dioguardi, Equitable did not participate in any way in the negotiation of the contract, and its consulting services were never requested or used by the Kerin management. The Kerin companies continued to pay Equitable $200 a month until July, 1956, when they were instructed by the District Attorney’s office to discontinue the payments. A total of $4,700 had been paid to Equitable, which was the amount defendants were charged in the indictment with extorting. In August, 1957, pursuant to a petition filed by a Kerin employee and following an election conducted by the N. L. R. B., Local 29'5 was “ deauthorized ” as bargaining agent for the Kerin employees.
Upon the proof in this record, a jury could properly conclude that defendants were guilty of extortion—cleverly conceived and subtly executed, but extortion nonetheless. The essence of the crime is obtaining property by a wrongful use of fear, induced by a threat to do an unlawful injury (Penal Law, §§ 850, 851). It is well-settled law in this State that fear of economic loss or harm satisfies the ingredient of fear necessary to the crime (People v. Barondess, 133 N. Y. 649, revg. on dissenting opinion below 61 Hun 571, 581; People v. Weinseimer, 190 N. Y. 537, affg. 117 App. Div. 603).
Moreover, it is not essential that a defendant create the fear existing in the mind of his prospective victim so long as he succeeds in persuading him that he possesses the power to remove or continue its cause, and instills a new fear by threatening to misuse that power as a device to exact tribute (People v. Weinseimer, 117 App. Div. 603, 607, supra; Callanan v. United States, 223 F. 2d 171, cert, denied 350 U. S. 862; United States v. Varlack, 225 F. 2d 665). Our statute, as well as the Hobbs or Federal Anti-Racketeering Act (U. S. Code, tit. 18, § 1951, subd. [b], par. [2]) which was patterned after it (United States v. Sweeney, 262 F. 2d 272,275, fn. 3), talks in terms of a wrongful use of fear, and the ultimate issue ‘ ‘ is not so much the cause of the victim’s fear, as it is whether or not defendants played upon that fear, in other words, made use of that fear to extort money or property ’ ” (Callanan v. United States, 223 F. 2d 171, 174, supra).
The Kerin management unmistakably feared that the continued existence of the picket line and the perpetuation of the *269 ostensible organizational struggle between competing locals would put their companies out of business. The failure to establish that this fear was initially induced by or attributable to either defendant, or someone acting in concert with them, is not determinative, so long as there was proof that defendants " seized upon the opportunity presented by” that fear “to line their own pockets by implanting in the minds of the company officials the idea that unless and until the tribute demanded was paid to the defendants ’ ’, the picketing and labor war would continue (United States v. Varlack, 225 F. 2d 665, 668 supra). The decision in People v. Gardner (144 N. Y. 119) implies nothing to the contrary, since the victim of an attempted extortion in that case was not actuated by fear of any kind, either preexisting or newly created, and exploitation of an independently instilled fear was in no way involved.
As to the element of a threat, the crux of defendants’ position is that McNamara was under no duty to intervene to alter the existing situation, and a threat to do nothing to aid the Kerin management if they did not assent to the terms of his proposal is not tantamount to a threat to do an unlawful injury within the contemplation of the statute. However, section 858 of the Penal Law expressly makes it “immaterial” to the crime of extortion “ whether a threat * * * is of things to be done or omitted by the offender, or by any other person ” (emphasis supplied), and we long ago held: “ No precise words aré needed to convey a threat. It may be done by innuendo or suggestion. To ascertain whether a letter [or oral proposal] conveys a threat, all its language, together with the. circumstances under which it was written [or spoken], and the relations between the parties may be considered, and if it can be found that the purport and natural effect of the letter [or oral proposal] is to convey a threat, then the mere form of words is unimportant.” (People v. Thompson, 97 N. Y. 313, 318; emphasis supplied.) If McNamara, acting for himself and Dioguardi’s alter ego, Equitable, professed to have control over the labor problems besetting the Kerin companies, i.e., if he instilled the belief in the minds of the Kerin officers that the continuance or discontinuance of the picket line and the labor 'war rested with him and Equitable, and he demanded tribute for the exercise of that control, then he effectively conveyed a threat to do *270 an unlawful injury, and he and those acting in concert with him could properly be convicted of extortion.
Local 210, which threatened to organize the Kerin companies by picket lines if necessary, and Local 138, which ostensibly commenced the potentially ruinous picket line, were both teamster unions, and from the beginning McNamara was pictured to Coogan, and, in turn, to the Kerin management, as a powerful and high-ranking figure in the teamster organization. McNamara effectively heightened this image by displaying to Coogan a familarity with the labor difficulties faced by his client, and by suggesting that the matter could be “ settled almost immediately ’ ’ by the payment of as much as $10,000. He discouraged resort to a consent election, since Locals 210 and 138 were “old-line unions ” who would press their organizational efforts to the utmost, and not willingly forego their investment in organizational expenses. He further darkened the picture by informing C'oogan that it was “ entirely probable ” that other unions would respect the organizational picket line, and there was no “ real hope ” that even partial deliveries would continue. There is also evidence that McNamara left C'oogan with the impression—thereafter conveyed to the Kerin officers — that he had the power to intensify the picket line by having the Joint Council issue orders to all teamster locals to make the picket line 100% effective, with the necessary result of putting the Kerin companies out of business.
It seems clear, at all events, that the “ furious ” Kerin, Sr., as well as the other two corporate officers, agreed to meet with McNamara because they believed he possessed the power to cure the labor situation which threatened their businesses with potential ruin. During the private chat suggested by the bogus attorney Holt, McNamara confidently assured Kerin, Sr., that, his troubles not merely ‘ ‘ could be ended ’ ’ but ‘ ‘ would be ended” if his (McNamara’s) package deal were accepted. McNamara flatly stated that the picket “ would be out of there by Monday morning” and, if any other union attempted to organize, “ all we had to do. was tell them that we were members of his local, and that that should be enough for them, and advise him and advise the Equitable Research Associates of our problem ”. All the Kerin officers testified, in substance, that McNamara induced them to believe that they would be guar *271 anteed labor peace if they made the suggested payments. While Kerin, Sr., experienced no personal fear, he did fear economic harm, for he testified unequivocally that “ the fundamental reason for my going through with this kind of an arrangement was to preserve my company, fearing that if I did not meet these conditions with Mr. McNamara, that we would be closed up.” (Emphasis supplied.) Schumann believed that “ If this agreement was not reached, we had reason to believe then that the picket line would remain ’ ’ and that ' ‘ we would be very seriously damaged and maybe forced out of business ”. Kerin, Jr., ‘ ‘ very definitely * * * was fearful that if we did not effect a settlement, and effect it pretty quickly, on this picketing, that we were going to be put out of business ’ ’.
Viewing the evidence in its aspect most favorable to the People, as we must upon this appeal, the present case is indistinguishable from People v. Weinseimer (supra) —where the president of a striking labor union successfully induced the employer to believe that, unless he were paid a substantial sum, he would prevent the employees from returning to work—and People v. Barondess (supra)—where a union manager told a struck employer: “ * You have got to pay me five hundred dollars to have your people back again to work ’ ” (61 Hun 571, 583, supra). The picketing here, like the strikes in those cases, may have been perfectly lawful in its inception (assuming it was part of a bona fide organizational effort) and may have remained so — despite its potentially ruinous effect on the employers’ businesses — so long as it was employed to accomplish the legitimate labor objective of organization. Its entire character changed from legality to criminality, however, when it was used as a pressure device to exact the payment of money as a condition of its cessation (see People v. Hughes, 137 N. Y. 29, 39). The fact that McNamara, unlike Weinseimer and Barondess, was not an official of the particular local engaging in the injurious activity is immaterial, so long’ as he and Equitable professed to have power to eliminate or continue it, and used that purported power as a lever to exact tribute. Although McNamara “ did not expressly represent that he controlled” the picket and Kerin, Sr., ‘ did not expressly testify that he believed that the defendant would keep the [picket line going] unless his demands were acceded to”, the evidence “fairly warranted the jury in finding those facts ” (People v. Wein *272 seimer, 117 App. Div. 603, 614, supra). While he “ did not expressly threaten [management] that he would do anything himself ’ ’, McNamara ‘ ‘ asserted himself to be in such a relation to the [picket] * * * as to control [its] movements ” (People v. Barondess, 61 Hun 571, 579, 584, supra), and instilled the belief that the picketing would continue unless his monetary demands were met. The power to remove a picket clearly implies the power to maintain it. The jury could properly infer that the substance of McNamara’s proposal was: “ You have got to pay Equitable $3,500 down and $200 a month to have the picket removed and labor peace guaranteed.” This, to our minds, is indistinguishable from ‘ ‘ the only evidence of any threat made by defendant ” in the Barondess case (61 Hun 571, 579, supra; see, also, People v. Lamm, 292 N. Y. 224, 229-230).
Moreover, in the present case, we have not only ‘ ‘ the pretense of control ’ ’, but clear evidence of achial control. On the business day next following the Manhattan Club meeting, before any money loas paid and before any written contract with Equitable had been signed by management, no picket or organizer appeared at the Kerin premises. McNamara promptly reminded management to notice ‘ you have no more picket ’ ’, and, so long as the monthly payments to Equitable continued, labor peace ensued. Any doubt concerning the ‘ control ’ ’ flavor of the entire transaction seems dissipated by the necessity of $200 monthly payments to the labor consultant who never advised and was never consulted. As the People contend, the jury could reasonably infer that the Kerin companies continued to make these payments ‘ ‘ because of a plain implication that [Equitable’s] demonstrated influence and control could and doubtless would be exerted to restore and even intensify the labor predicament just as readily as it could be and was employed to terminate it.”
As to defendant Dioguardi, the jury could, properly find that he was a knowing participant in the extorsive scheme, and acted throughout in concert with McNamara. It was Equitable which was constantly depicted as the essential force in solving the labor problems besetting the Kerin companies, and Equitable in reality was Dioguardi. Re signed the contracts with the two Companies calling for a down payment of $3,500 and monthly payments of $200 thereafter, in return for labor negotiating and *273 counseling services which were never rendered. He withdrew the $3,500—most of it as salary —- within nine days after receipt thereof, and received all the subsequent payments. McNamara’s original appointment with White was at the Equitable office; one of the two telephone numbers at which McNamara told Coogan he could be reached was Equitable’s. Milton Holt, the bogus “ attorney ” who met McNamara at Billy Grwon’s restaurant promptly after a telephone call, and who accompanied him to the Manhattan Club, had been a witness to the office lease signed by Dioguardi on behalf of Equitable, and was a friend of both Dioguardi and McNamara. Finally, during a discussion with one of the Kerin officers several months after the arrangement was consummated, Dioguardi manifested familiarity therewith, and personally requested that a copy of the collective bargaining agreement with McNamara’s union be sent to him. The jury had the right to conclude that Dioguardi was the effective power behind McNamara’s teamster throne, and that both were guilty of the crimes charged.
The suggestion made by McNamara’s attorney at the trial— and apparently adopted by the Appellate Division majority — that defendants were indicted for the wrong crime, i.e., that the offense committed was the solicitation or acceptance of a bribe by a labor representative (Penal Law, § 380, subd. 2, added by L. 1953, eh. 675, and made a felony by L. 1959, ch. 609), need not trouble us. Bribery of a labor representative and extortion have been held to be mutually exclusive crimes {People v. Feld, 262 App. Div. 909), and that is undoubtedly correct, since section 380 of the Penal Law makes the payor equally as guilty as the payee, which could never be the case with extortion.
As noted in Hornstein v. Paramount Pictures (22 Misc 2d 996, 1003, 1006, affd. 266 App. Div. 659, affd. 292 N. Y. 468), where payments to labor officials to forestall a threatened strike were held to constitute extortion rather than bribery, ‘ ‘ the essence of bribery is the voluntary giving of something of value to influence the performance of official duty ’ ’, whereas the essence of extortion is “duress”. Although the theoretical distinction between the two crimes is clear, the line of demarcation may not, in practical application, always be clear, particularly where, as here, the allegedly extorsive demand for payment *274 was couched in the form of polite suggestions, and it is claimed that the payments were solicited from a receptive and willing donor.
It is true that McNamara was originally brought into the picture by persons acting on behalf of the Kerin companies; that Kerin, Sr., testified that his relations with McNamara were always cordial and that McNamara always acted like a gentleman. In light of this and other evidence, defendants unquestionably were “ entitled to have the jury instructed that if the employer were guilty of bribery, the [defendants] could not be guilty of extortion ” (People v. Feld, 262 App. Div. 909, supra).
The trial court did so charge the jury—although it might have more thoroughly developed the distinction between bribery and extortion—but surely defendants were not entitled to a directed verdict of not guilty. Where it is perfectly clear that either one or the other of two mutually exclusive crimes has been committed, and where the line of demarcation in a particular case depends upon the evaluation of particular facts, the question may not 'be resolved by the court as a matter of law. It is the province of the jury, under clear and complete instructions from the court, to consider and weigh the facts, and to determine the defendants’ guilt or innocence of the crime charged. Upon this record, the question of whether the crime committed was bribery or extortion was purely ‘ a question of fact” (People v. Feld, supra), and it cannot be said as a matter of law that under no view of the testimony could the jury find the defendants guilty of extortion.
McNamara was initially sought out, not as a likely candidate for a bribe, but for the entirely legitimate purpose of helping to arrange a consent election between competing teamster locals. It was he who first suggested the payment of tribute and, when this was reported to Kerin, Sr., he bitterly asserted that he would rather close up his business than “ pay ten thousand dollars, or any amount of money, to anybody ” (emphasis supplied) . It was McNamara who followed up his discussion with Coogan, and, according to Kerin, Jr., and Schumann, Kerin, Sr., agreed to meet with McNamara only to verify whether there was any need of paying anything, and not to bargain for a reduced amount. During their private “ chat ”, when Kerin, Sr., protested to the payment of $3,500 as a hold-up ”, McNamara *275 flatly warned him that he had to pay. Although Kerin, Sr., stated that he had no fault to find with the arrangement consummated, he made it clear he knew that “if I didn’t go through with this arrangement, my business would be closed up ”. Indeed, he repeatedly testified that he “ knew ” he “ had to pay ” to prevent “ an absolute closure of our business ”, and thus the jury could find that the payments here, as in the Hornstein case (supra), ‘ unquestionably were made because of * * * an honestly entertained and reasonably based belief that they were necessary to keep going the business ” (22 Mise 2d 996, 1006). The fact that Kerin, Sr., wished to perpetuate his hope and ambition of bequeathing the business to his son in no measure precludes a finding that the payments were extorsive. The crucial testimony is that he “ knew ” he “ had to pay ” to keep the companies operating, “ fearing that if I did not meet these conditions with Mr. McNamara, that we would be closed up ” (emphasis supplied). It is compulsion that distinguishes extortion from bribery—“ obtaining the property of a corporation from an officer * * * thereof, with his consent, induced by a wrongful use of * * * fear ” (Penal Law, § 850; emphasis supplied). Bribery is unqualified “ voluntary giving ” (Hornstein v. Paramount Pictures, supra, p. 1003).
As to McNamara’s representation that the $3,500 down payment to Equitable was to be distributed to the competing unions as reimbursement for their organizational expenses, the jury was entitled to conclude that this was a bald fabrication. The $3,500 was deposited in Equitable’s bank account, and within nine days thereafter virtually all of it was withdrawn, Dioguardi having personally checked out most of it to himself as salary. None of it was used to reimburse other unions for picketing or other organizational expenses, which McNamara represented to Kerin, 'Sr., was an indispensable condition to inducing them to withdraw. The circumstance that the picketing stopped promptly upon the payment of this $3,500 to defendants without their distributing it to other unions or the leaders thereof is evidence from which the jury could conclude that defendants themselves controlled the picketing, and were exacting payment to and for themselves as a condition of relieving the economic pressure on Kerin, Sr. ’s, companies which he so greatly feared. *276 All the officials of Teamster Local 138 testified that they had never authorized, or known, anything about the lone picket, who was carrying their placard, and hence they would hardly have been reimbursed for expenses they never incurred. Indeed, their testimony demonstrates that they had nothing to do with the removal of the mysterious picket, and puts the lie to McNamara’s representation that he would have to reimburse the picketing union for its expenses before it would agree to withdraw. It is perfectly clear from the record that defendants never intended to pay any part of the $3,500 to any of the unions involved, and that, in fact, the money went directly into Dioguardi’s pocket promptly after the picket was removed, as McNamara promised.
Surely the jury was entitled to conclude that the payments were essentially involuntary, and motivated, as in the Hornstein ease, by “ ‘ some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the * * * property of another, from which the latter has no other means of immediate relief than by making the payment ’ ”. (22 Misc 2d 996, 1007.) “ The characteristic of duress ”, as further noted in that case (p. 1008), “ is that a choice is made of the lesser of two evils according to interest ”. The jury could reasonably find that such a choice was presented to Kerin, Sr., and that he agreed to make the suggested payments only so as to guarantee the continued operation of businesses that grossed several million dollars a year.
To hold as a matter of law that the crime committed was bribery rather than extortion would necessarily mean that the Kerin officers were equally as guilty as defendants. We “ are not ready to impute to section 380 of the Penal Law the meaning that one who is victimized by an extortion of the kind in question ” has committed a crime (Hornstein v. Paramount Pictures, 292 N. Y. 468, 471-472, supra). Labor extortion affects not merely the victim, but to a much greater degree the workers in the labor movement, and more especially the community as a whole. It is a wrong which the government deems injurious to the public at large, and thus punishes through a judicial proceeding in its own name.
*277 The orders appealed from should be reversed, the indictments reinstated, and a new trial ordered.
Judges Van Voorhis, Burke and Foster concur with Judge Froessel; Chief Judge Desmond and Judges Dye and Fuld dissent and vote to affirm upon the Appellate Division opinion.
Orders reversed, etc.