The People of the State òf New York, Appellant, v Martin Forde, Respondent.

First Department, February 20, 1990

467

## APPEARANCES OF COUNSEL

*Howard L. Perzan* of counsel *(Mark Dwyer, Robert A. Mass* and *Joseph P. Armao* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Thomas J. Cahill* for respondent.

### OPINION OF THE COURT

Ross, J.

The primary issue presented in this appeal is whether an indictment charging extortion is legally sufficient, where the alleged extortion resulted from the enforcement of an otherwise legal contract.

In December 1986, a New York County Grand Jury commenced an investigation into alleged corruption in the carpentry and dry wall industry.

Mr. Roger Berk, who was the president of Haywood-Berk Flooring Company (Haywood), which is located in New York County, was a witness before that Grand Jury.

He testified that Haywood was engaged in the business of installing and refinishing floors, and in the fall of 1985, Haywood began work in the Equitable Life Insurance building (Equitable), located at 7th Avenue, between 51st and 52nd Streets, Manhattan, pursuant to a $625,000 contract. The provisions of the Equitable contract required Haywood to, in substance, install parquet floors, which, since intricate work was involved, required carpenters, with special skills, and it was the largest contract Haywood had ever received.

Further, Mr. Berk testified that Haywood had a collective bargaining agreement with the United Brotherhood of Carpenters and Joiners Union (Union), which contained clauses which obligated Haywood to obtain from the Union up to 50% of the number of carpenters used on a jobsite, and prohibited Haywood from using "lumpers", who were carpenters who were paid by the amount of work they completed, rather than by the hour. Whether the Union actually enforced the "matching" and/or "lumpers" clauses depended on the decision of the business agent of the Union local, located in the area of the jobsite.

The Equitable job was located within the jurisdiction of Local 608.

Expensive wood was being used on the Equitable job, and Mr. Berk testified "[w]ood flooring is not terribly common. Very few men can actually do it. The men who do that kind of work usually are trained by the company that do it[, such as Haywood]".

Since the Equitable contract was the largest that Haywood

had ever received, and as mentioned *supra,* the carpenters were required to do specialized work, Mr. Berk testified that he was very apprehensive about dealing with Local 608, in view of the fact same had, *inter alia,* a reputation for corruption in the industry, and a habit of sending unskilled men "who * * * deliberately had to make a job worse, to sabotage a job". Specifically, he remembered a 1979 job on which he was working for his father, when a group of men from Local 608 had arrived on that jobsite, and "deliberately * * * just made it a real mess".

Without a waiver of immunity, Mr. Berk testified three times before the Grand Jury, on January 9, 26, and June 29, 1987. On that last date, he testified that, due to his fear of retaliation from the Union, he had lied in his previous testimony, by, *inter alia,* giving false answers to questions about unlawful dealings he had with various officials of Local 608, such as Messrs. John O'Connor and Martin Forde. He promised to henceforth testify truthfully, pursuant to his agreement with the New York County District Attorney's office (DA), which provided that he would not be prosecuted for perjury and contempt.

Mr. Forde was a business agent for Local 608. Soon after the Equitable job was underway, in approximately September or October 1985, Mr. Berk received a telephone call from Mr. Forde, who sounded very agitated. In that conversation, Mr. Forde summoned Mr. Berk to his Union headquarters office because, according to Mr. Forde, there was trouble on the jobsite, since Haywood was not using men from Local 608.

On June 29th, Mr. Berk testified that, when he arrived at Mr. Forde's office that afternoon, Mr. Forde told him, in substance, there was a problem, since Mr. Forde was being embarrassed by the lack of Local 608 men on the Equitable jobsite. In response, Mr. Berk testified: "I told Martin [Forde] I don't want any trouble and he said, 'well, what's it worth to you'. I said 'Martin * * * I don't know' ". Thereafter, Mr. Berk testified that Mr. Forde "either indicated with his fingers or whispered very low, I'm not sure which, two, like that", and our examination of the record indicates that, when Mr. Berk uttered the words "two, like that", he held up two fingers "like a victory sign". Further, Mr. Berk testified that he asked Mr. Forde if he meant 2,000, and Mr. Forde "nodded, yes * * * and that was the end of that meeting."

Further, Mr. Berk testified that he interpreted Mr. Forde's

conduct to be "an implied threat", which meant that, if Mr. Berk did not pay Mr. Forde $2,000, Mr. Forde would use, *inter alia,* the "matching" clause of the collective bargaining agreement to send a large number of unqualified men from Local 608 to the highly specialized Equitable job, and the effect of that would have been financially costly to his company.

A couple of days after his meeting with Mr. Forde, Mr. Berk testified that he telephoned Mr. Forde and invited him for lunch at Gallagher's restaurant, in New York County. When lunch was over, Mr. Berk testified he went to the bathroom in that restaurant, and "I did have two thousand dollars in my pocket * * * and I noticed that Martin [Forde] was following me very close behind [into the bathroom]. * * * I took out the envelope which contained the money, and I either placed it on a shelf, or on the sink, or something, and, Martin [Forde] took it and picked it up, he put it away". After completing the transfer of the $2,000 to Mr. Forde, Mr. Berk testified they left the bathroom.

In May 1986, Mr. Berk was then cooperating with the DA, and as a result, he wore a concealed tape recorder when he met Mr. Forde at the Movenpick Restaurant. During that meeting, Mr. Berk testified that, while Mr. Forde admitted having lunch with Mr. Berk in Gallagher's Restaurant, Mr. Forde denied receiving any money at that time.

Throughout the remainder of the Equitable job, Mr. Berk testified that, although Local 608 sent some men to the job, the number was far lower than 50% of the total number of carpenters for the job.

Upon the basis of Mr. Berk's testimony, by indictment, number 7951, filed September 4, 1987, the Grand Jury charged Mr. Forde (defendant) with committing the crimes of grand larceny in the second degree, by extortion (Penal Law § 155.35), grand larceny in the second degree (Penal Law § 155.35), bribe receiving by a labor official (Penal Law § 180.25), and engaging in a specific prohibited financial interest and transaction (Labor Law § 723 [1] [e]; § 725 [4]).

Defendant moved to dismiss that indictment, and Criminal Term granted that motion. Accordingly, we have this appeal by the People.

■ When a defendant moves to dismiss an indictment, pursuant to CPL 210.30, "the standard of judicial scrutiny is whether there was 'competent evidence which, if accepted as true, would establish every element of an offense charged and

the defendant's commission thereof' (CPL 70.10, subd 1)" *(People v Warner-Lambert Co.,* 51 NY2d 295, 298 [1980], *cert denied* 450 US 1031 [1981]). The Court of Appeals held in *People v Mayo* (36 NY2d 1002, 1004 [1975]) that "[i]n the context of the Grand Jury procedure, legally sufficient [evidence] means prima facie, not proof beyond a reasonable doubt".

In evaluating the sufficiency of the evidence considered by the Grand Jury, we are required to determine "whether the evidence viewed in the light most favorable to the People, if unexplained and uncontradicted, would warrant conviction by a petit jury" *(People v Jennings,* 69 NY2d 103, 114 [1986]).

Until rebutted, the presumption is that indictments are valid *(People v Pelchat,* 62 NY2d 97, 106 [1984]). A defendant, who moves to dismiss an indictment, bears the burden of proof that same is legally insufficient *(People v Howell,* 3 NY2d 672, 675, 677 [1958]; *People v Deitsch,* 97 AD2d 327, 329 [1983]).

Count one of the indictment, which charges the crime of grand larceny in the second degree, by extortion, reads, in pertinent part, that defendant "stole property, to wit, $2000, from Roger Berk, by instilling in Berk the fear that if the money were not delivered to him, Forde and others would perform an act which would not in itself materially benefit Forde but which was calculated to harm Berk materially with respect to his business, to wit, that Ford would require that fifty percent of all men on a certain jobsite of Haywood-Berk Flooring, Berk's company, be sent to the site by the union and to prohibit the use on that jobsite of 'lumpers' ".

Penal Law § 155.05 (2) (e) defines larceny by extortion, in pertinent part:

"A person obtains property by extortion when he compels or induces another person to deliver * * * property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will * * *

"(ix) Perform any other act which would not in itself materially benefit the actor but which is calculated to harm another person materially with respect to his health, safety, business, calling, career, financial condition, reputation or personal relationships".

More than a century ago, the Court of Appeals held, in *People v Thompson* (97 NY 313, 318 [1884]), that the use of precise words are not necessary to convey a threat, which

constitutes a crime, since innuendo or suggestion may be sufficient, if, based upon the circumstances and the relationship between the parties, the purport and natural effect of the innuendo or suggestion is found to convey a threat, and then the form of the words are unimportant. Obviously, "[t]hreats which, by their nature, are illegal are generally not publicly expressed nor memorialized in writing. Indeed, threats can be made and clearly understood without verbal communication" *(People v Court,* 52 AD2d 891, 892 [1976], *affd on mem of App Div* 43 NY2d 817 [1977]).

The United States Court of Appeals, Second Circuit, affirmed a conviction for extortion, of a business agent of Local 129, Cloak-Out-Of-Town Department of the International Ladies' Garment Workers' Union *(United States v Tolub,* 309 F2d 286 [1962]). In that case, the business agent instilled fear in an employer, by threatening to cause labor strife, which would affect the financial well-being of that employer's company, if the employer did not comply with the business agent's demand for money, and upon the basis of that threat, the employer complied. The Second Circuit stated, in *United States v Tolub (supra,* at 289): "Appellant claims that the numerous and extensive social contacts he had with [the employer] during the period covered by the alleged payments negate the threats, if any, and show lack of fear. But [the employer] testified that [the business agent] 'was a fundamental part of my business and I wanted to avoid any further pressing so I socialized with him'. This was a question for the jury which resolved it against the appellant."

Our review of the existing case law leads us to conclude that a person may be convicted of extortion, although he or she had a social relationship with the victim. Therefore, *United States v Tolub (supra)* is relevant to the instant case, wherein Mr. Berk, although he had a cordial relationship with defendant, complied with defendant's demand for $2,000, since he feared that defendant would otherwise carry out his threat to use the "matching" clause of the collective bargaining agreement, which act would be financially costly to his company.

After our examination of Penal Law § 155.05 (2) (e) (ix), which was set forth *supra,* we find that clause (ix) of that paragraph (e) makes it a crime for a person to threaten to perform any act, which is calculated to materially harm, *inter alia,* another person's business. Since we do not find any language contained in clause (ix), which indicates that the

words "any other act" mean that the act threatened must itself be illegal, we further find that the Legislature intended to include otherwise lawful acts within that phrase *(see, Matter of Petterson v Daystrom Corp.,* 17 NY2d 32, 38 [1966]). In other words, although defendant had the legal right to use the "matching" clause of the collective bargaining agreement to require Mr. Berk's company to obtain from Local 608 up to 50% of the carpenters used on the jobsite, defendant committed a crime, when he threatened the use of the otherwise legal "matching" clause to harm Mr. Berk's company business, unless Mr. Berk paid him $2,000, since the defendant's use of the "matching" clause was intended to extort money, rather than to carry out a legitimate objective of the Union.

In *People v Dioguardi* (8 NY2d 260 [1960]) the Court of Appeals held that an otherwise lawful act becomes unlawful, when same is used as a threat to extort money. That court stated, in pertinent part *(supra,* at 271): "The picketing here * * * may have been perfectly lawful in its inception (assuming it was part of a bona fide organizational effort) and may have remained so—despite its potentially ruinous effect on the employers' businesses—so long as it was employed to accomplish the legitimate labor objective of organization. Its entire character changed from legality to criminality, however, when it was used as a pressure device to exact the payment of money as a condition of its cessation".

We therefore find, that although defendant had a right to enforce the legal labor contract between the Union and Haywood, the manner in which defendant used said contract to threaten to injure Haywood's business, by informing Haywood that defendant would not enforce the labor contract upon payment of $2,000 to defendant, was an illegal use thereof, rising to the crime of extortion.

Based upon our factual and legal analysis, *supra,* we find that the People, as to count one, have presented sufficient evidence to the Grand Jury to enable same to conclude that an indictment would lie for the crime of extortion, by threatening to harm Mr. Berk's business, if he did not pay defendant $2,000.

 Also, we further find, that the People submitted prima facie evidence to the Grand Jury, which enabled same to conclude that defendant committed the crimes contained in counts two, three, and four of the indictment. Count two, grand larceny in the second degree (Penal Law § 155.35),

charges, in substance, that defendant unlawfully "took" from the Union the contract right, which required Mr. Berk's company to obtain from the Union up to 50% of the number of carpenters used on a jobsite; count three, bribe receiving by a labor official (Penal Law § 180.25), charges, in substance, that defendant, as a business agent of Local 608, solicited and accepted the sum of $2,000 from Mr. Berk, "upon an agreement and understanding that the money would influence [defendant] in respect to his acts"; and, count four, engaging in a specific prohibited financial interest and transaction (Labor Law § 723 [1] [e]; § 725 [4]), charges, in substance, that defendant violated his fiduciary obligations, as an officer and agent of Local 608, by receiving $2,000 from Mr. Berk's company, "an employer whose employees Local 608 represents and seeks to represent for purposes of Collective Bargaining".

In summary, we find that the evidence "if unexplained and uncontradicted, would warrant conviction by a petit jury" *(People v Jennings, supra,* 69 NY2d, at 114).

We have considered the other contentions of the defendant and find them to be without merit.

Accordingly, order, Supreme Court, New York County (Dorothy A. Cropper, J.), entered on or about September 15, 1988, which granted defendant's motion to dismiss indictment number 7951 of 1987, should be unanimously reversed, on the law and on the facts, motion denied, indictment reinstated in its entirety, and the matter remanded to the trial court for further proceedings.

SULLIVAN, J. P., CARRO, MILONAS and ROSENBERGER, JJ., concur.

Order, Supreme Court, New York County, entered on or about September 15, 1988, unanimously reversed, on the law and on the facts, the motion denied, the indictment reinstated in its entirety, and the matter remanded to the trial court for further proceedings.