**NEW YORK TRANSPORTATION, INC., Igor Plotnik and Nina Plotnik, Plaintiffs,**

v.

**NAPLES TRANSPORTATION, INC., Getaway Dispatching, Inc., Anthony Piscopo, Edward Stranz and Murray Kufeld, Defendants.**

No. 99–CV–1813 (FB).

United States District Court, E.D. New York.

Oct. 10, 2000.

John M. Wilson, Brooklyn, New York, for plaintiffs.

Raphael F. Scotto, Scotto, Georgoulis & Dockery, New York City, for defendants.

## MEMORANDUM AND ORDER

BLOCK, District Judge.

Plaintiffs New York Transportation, Inc. ("New York Transportation" or "the company"), Igor Plotnik ("Plotnik") and Nina Plotnik have brought this action against defendants Naples Transportation, Inc. ("Naples"), Getaway Dispatching, Inc.

(Getaway), Anthony Piscopo ("Piscopo"), Edward Stranz ("Stranz") and Murray Kufeld ("Kufeld") alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, as well as asserting several related state law claims. Defendants have moved to dismiss the complaint pursuant to Fed. R.Civ.P. 4(b), 9(b), and 12(b)(6). For the reasons set forth below, plaintiffs' RICO claims are dismissed; the Court elects to retain jurisdiction over the plaintiffs' state law claims.

## BACKGROUND

The following allegations are drawn from the complaint, which the Court accepts as true for purposes of this motion. In October 1995, Plotnik purchased the assets of Cape Transportation, Inc. ("Cape") from Piscopo and Stranz. Cape operated Getaway Car Service, a car service business based in Brooklyn, New York. Plotnik formed New York Transportation to receive the assets purchased from Cape, and operate as an independent car service business.

Subsequent to the transfer, New York Transportation obtained a taxi base license and a radio station license. It also obtained a $75,000 bank loan ("the bank loan"), guaranteed by the Plotniks, that it used primarily to purchase new automobiles.

In late 1997, Plotnik was approached by Piscopo. Piscopo advised Plotnik that he, Stranz and Kufeld were interested in obtaining shares of New York Transportation stock in exchange for their promise to arrange the company's entry into the luxury limousine business. Plotnik rejected the offer. Following Plotnik's rebuff, Piscopo told him that he considered the company to be under his "protection," and that Plotnik "owed him" for his "protection services." Compl. ¶¶ 23, 24. Piscopo also informed him that he knew where the Plotniks lived, and warned him that it would be in the best interest of his wife and child to agree to the proposal. Piscopo further threatened to open a car service business to compete with New York Transportation.

In December 1997, Plotnik acceded to Piscopo's demands and transferred seventy-five percent of the shares in New York Transportation to Piscopo, Stranz and Kufeld for no consideration. Piscopo assumed control of the company immediately following this transaction.

Once in control, the individual defendants froze Plotnik out of New York Transportation's operations. Piscopo then commenced a scheme wherein he purchased as many as sixteen used cars on the company's credit. Piscopo arranged for a car dealer to report an inflated price to the lending company. When the loan proceeds had been received, the car dealer would keep an amount equal to the actual price of the vehicle and pay the balance directly to Piscopo while the company assumed responsibility for the full amount of the loan. Piscopo forced Plotnik to execute the paperwork necessary to advance these transactions. Subsequently, defendants transferred title to New York Transportation's vehicles, the company's taxi license and other assets to Naples and Getaway, forging Plotnik's signature as necessary. Defendants also used the proceeds of the bank loan, but ceased making payments to the bank.

In April 1998, Piscopo forcibly removed Plotnik from New York Transportation's offices and told him not to return. Plotnik visited the company's premises on at least two occasions subsequent to April 1998, the latest in January 1999. Each time Piscopo threatened him with bodily injury. Plaintiffs commenced the present action in March 1999.

## DISCUSSION

### I. Motion to Dismiss for Improper Service under 4(b)

■ Defendants contend that the complaint must be dismissed pursuant to Fed. R.Civ.P. 4(b) because the summons served with the complaint did not bear the raised seal and original signature of the clerk. Fed.R.Civ.P. 4(b) provides:

Issuance. Upon or after filing the complaint, the plaintiff may present a summons to the clerk for signature and seal. If the summons is in proper form, the clerk shall sign, seal, and issue it to the plaintiff for service on the defendant. A summons, or a copy of the summons if addressed to multiple defendants, shall be issued for each defendant to be served.

The language of Rule 4(b) makes clear that when multiple defendants are to be served, a copy of the summons issued by the clerk may be served on each defendant. The Advisory Committee Notes following Rule 4 further explain that "[i]f there are multiple defendants, the plaintiff may secure issuance of a summons for each defendant, or may serve copies of a single original bearing the names of multiple defendants if the addressee of the summons is effectively identified." Defendants in arguing for dismissal in this case appear to be relying on the language of Rule 4 prior to its amendment in 1993. Under pre-amendment Rule 4, service of a copy of a summons was not expressly authorized. However, even under the pre-amendment rule, only when a technical error in the form of a summons "actually result[ed] in defendant's prejudice or demonstrate[d] a flagrant disregard of the requirements of Rule 4[ ] . . . [wa]s the court likely to rule that a failure to comply precisely with Rule 4[ ] c[ould] not be cured by amendment." 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1088 (2d ed.1987). Plaintiffs' service of photocopies of the original summons on defendants in this action meets the requirements imposed by post-amendment Rule 4, in effect since December 1, 1993.

## II. Standard on a 12(b)(6) Motion to Dismiss

In considering a motion to dismiss, the court's task is "necessarily a limited one." *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

"[I]n ruling on [the] defendant[s'] motion, the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d Cir.1997). The court should grant such a motion only if, after viewing the plaintiff's allegations in the most favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Feder v. Frost,* 220 F.3d 29, 32 (2d Cir.2000) (same).

Additionally, RICO claims in which the predicate acts are alleged to have involved fraud must meet the rigorous standard of Fed.R.Civ.P. 9(b) to survive a motion to dismiss. Under Rule 9(b), averments of fraud must be stated "with particularity." *See Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172–73 (2d Cir.1999) (citation omitted).

"In the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. The plaintiffs must also identify the purpose of [alleged] mailing[s] within the defendant's fraudulent scheme . . . [and] must allege facts that give rise to a strong inference of fraudulent intent."

*Id.* at 173 (internal quotations and citations omitted). Furthermore, "[i]n cases with multiple defendants, Rule 9(b) requires that the complaint allege facts that specify each defendant's connection to the fraud. General allegations against a group of defendant[s] are insufficient." *Schmidt v. Fleet Bank,* No. 96 Civ. 5030(AGS), 1998 WL 47827, at *5 (S.D.N.Y. Feb.4, 1998) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

## III. The RICO Claims

■ To state a claim under RICO, a plaintiff must allege: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) causation of the injury by the § 1962 violation. *See Pinnacle Consultants v. Leucadia Nat'l Corp.*, 101 F.3d 900, 903–04 (2d Cir.1996). Defendants argue, *inter alia*, that plaintiffs' RICO claims must be dismissed because the complaint fails to set forth facts sufficient to demonstrate a "pattern of racketeering activity" necessary to establish a RICO violation.

■ Section 1962 of RICO makes unlawful (a) the use of income "derived ... from a pattern of racketeering activity" to acquire an interest in, establish, or operate an enterprise engaged in or affecting interstate commerce; (b) the acquisition or maintenance of any interest in or control of such an enterprise "through a pattern of racketeering activity;" (c) the conduct or participation in the conduct of such an enterprise's affairs "through a pattern of racketeering activity;" and (d) conspiring to do any of the above. Therefore, at "[t]he heart of any RICO complaint is the allegation of a pattern of racketeering." *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 154, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Demonstration of a "pattern of racketeering activity" requires that the plaintiff plead at least two predicate racketeering acts that occurred within a ten-year period, *see* 18 U.S.C. § 1961(5), and "show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." *GICC Capital Corp. v. Technology Fin. Group, Inc.*, 67 F.3d 463, 465 (2d Cir.1995) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (racketeering activity "consists of no more and no less than commission of a predicate act").

■ The relatedness test merely requires the plaintiff to show that the predi-cate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893 (quoting 18 U.S.C. § 3575(e)); *see also GICC*, 67 F.3d at 467 ("plaintiff must provide some basis for a court to conclude that defendant's activities were neither isolated nor sporadic") (internal quotations omitted). To satisfy continuity, however, it must be shown that "the predicates themselves amount to, or that they otherwise constitute a threat of, continuing racketeering activity." *H.J. Inc.*, 492 U.S. at 240, 109 S.Ct. 2893. Critical to the "relatedness" and "continuity" analysis, therefore, is identification of the predicate acts since the duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit. *See H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. 2893; *see also GICC*, 67 F.3d at 467 (mere allegation that stock transfer was "fraudulent" was insufficient to allege a predicate act demarcating the beginning of pattern of racketeering activity). Plaintiffs assert that the predicate acts in this case extend from late 1997 through January 1999, approximately thirteen months, and are, therefore, sufficient to support their RICO claims. The alleged predicate acts subsequent to April 1998 consist solely of threats made by Piscopo to Plotnik when Plotnik visited the company's premises after he had surrendered the company to the defendants. Defendants contend that plaintiffs' allegations fail to establish a pattern of racketeering activity under both the relatedness and continuity prongs of *H.J. Inc.*

■ The RICO statute sets forth an exhaustive list of predicate acts. *See* 18 U.S.C. § 1961(1); *see also Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F.Supp.2d 345, 363 (E.D.N.Y. 2000) (Weinstein, J.). The allegations in the complaint covering the period between late 1997 and April 1998

adequately describe predicate acts of extortion, mail fraud and wire fraud, each of which is included under § 1961(1). The alleged predicate acts that occurred subsequent to April 1998, however, were mere threats. A threat, without more, is not a predicate act under § 1961(1).[1] These alleged threats, therefore, cannot be considered predicate acts for the purpose of calculating the duration of the alleged pattern of racketeering activity. Plaintiffs are left, then, with allegations supporting a pattern of racketeering activity extending from late 1997 through April 1998, a period of approximately six or seven months.

 Congress intended RICO to reach long-term criminal activity. *See, e.g., GICC,* 67 F.3d at 466. The Supreme Court in *Sedima,* therefore, introduced continuity, along with the associated concept of relatedness, as requirements in RICO cases in order to effectuate Congress' intent. *See* 473 U.S. at 496 n. 14, 105 S.Ct. 3275. In *H.J. Inc.,* the Supreme Court stated that continuity could be conceptualized as being either closed- or open-ended. *See H.J. Inc.,* 492 U.S. at 241–42, 109 S.Ct. 2893. Under the test for closed-ended continuity, the plaintiff must allege "a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. 2893. "Predicate acts extending over a few weeks or months ... do not satisfy" the requirement for closed-ended continuity. *Id.* While sufficient duration is central to a determination that the allegations satisfy closed-ended continuity, the Court may also consider a variety of non-dispositive factors, including,

*inter alia,* the number and variety of acts, the number of participants, the number of victims, the complexity of the scheme and the presence of separate schemes. *See GICC,* 67 F.3d at 467–68.

There is no bright line rule in this circuit that determines over what length of time predicate acts must extend in order to establish closed-ended continuity. *Cf. Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 611 (3d Cir.1991) (holding that twelve months is not a substantial period of time). However, the Second Circuit has found closed-ended continuity in only two cases, both of which involved acts that took place over at least two years. *See Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2d Cir.1992) (predicate acts occurring over two years); *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (predicate acts occurring over a number of years); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.,* 187 F.3d 229, 242 (2d Cir.1999) (Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time' ").

 The six- to seven-month period described in the complaint fails to meet the temporal test for continuity set forth in *H.J. Inc. See* 492 U.S. at 242, 109 S.Ct. 2893. Furthermore, this is essentially the same type of activity that the Second Circuit found insufficient to support a finding of closed-ended continuity in *GICC. See* 67 F.3d at 467 (defendants allegedly looted business over eleven months to allow it to escape obligations under promissory note); *see also Cofacredit,* 187 F.3d at 244 (predi-

---

1. Threats, not associated with an attempt to obtain property, are insufficient to allege the predicate act of extortion. Under federal law, extortion requires the obtaining of property from another, with his consent, induced either by wrongful use of actual or threatened force, violence or fear, or under color of official right. *See* 18 U.S.C. § 1951(b)(2); *see also* 3 Leonard B. Sand et al., Modern Federal Jury Instructions 50–9 (1999) ("There must be some nexus between the threat or use of force and the taking of property"). The same elements are required under New York law.

*See* N.Y.Penal Law § 155.05(e) (McKinney 2000); *see also People v. Dioguardi,* 8 N.Y.2d 260, 268, 203 N.Y.S.2d 870, 877, 168 N.E.2d 683, 688 (1960) (the "essence" of the crime of extortion is obtaining property by a wrongful use of fear). Plaintiffs do not allege that the mere threats Piscopo allegedly made during Plotnik's visits are sufficient to support extortion. Indeed, it is clear from the complaint that by the time the alleged threats were made, defendants were in complete control of New York Transportation and its assets.

cate acts of mail and wire fraud over approximately eleven months spanned insufficient time to demonstrate closed-end continuity). Even if plaintiffs were given the benefit of the entire thirteen-month period covered by the chronology of their complaint, Second Circuit precedent makes it unlikely that it would determine that predicate acts extending over thirteen months satisfies closed-ended continuity. Moreover, plaintiffs have alleged none of the non-dispositive factors that might tend to weigh in favor of finding closed-ended continuity in close cases. For instance, the scheme alleged in this case involves only two victims—Plotnik and his wife, a small number of participants and a single, limited objective. Finally, plaintiffs' assertion that it is illogical to require victims to allow a criminal scheme to continue in order to establish closed-ended continuity is both unfounded in law and unavailing under the circumstances of this case. Plaintiffs did, in fact, wait until the alleged scheme had fully succeeded before filing this action. Plaintiffs' allegations, therefore, do not establish closed-ended continuity.

 The test for open-ended continuity focuses not on duration, but on whether the past unlawful conduct projects the threat of future unlawful conduct. *See GICC*, 67 F.3d at 466. The Second Circuit has distinguished cases where a criminal scheme, though short-lived, has not reached a natural end from those involving the fraudulent transfer of property where the prospect of the transfer makes the project inherently terminable. *See United States v. Aulicino*, 44 F.3d 1102, 1113–14 (2d Cir.1995) (finding continuity where kidnaping ring had attempted seven of ten planned kidnapings in a 3½ month period before being broken up by police). However, "[w]here the nature of conduct or the enterprise does not by itself suggest that the racketeering acts will continue, courts must look to other external factors." *GICC*, 67 F.3d at 466 (citing *United States*

*v. Kaplan*, 886 F.2d 536, 542–43 (2d Cir. 1989)). In this case, defendants' alleged scheme was, by its very nature, terminable. The threat that defendants would engage in further efforts to take-over and loot New York Transportation necessarily ended when the company and it assets were under their control. Furthermore, plaintiffs have alleged no factors external to the scheme to suggest that defendants were prepared to engage in similar activities in the future. Plaintiffs, therefore, have not alleged facts sufficient to support a finding of open-ended continuity.

In sum, the Court cannot conclude that racketeering activities occurring over approximately six or seven months and without the threat of future unlawful activity constitute the sort of long-term criminal conduct that Congress targeted in RICO. *See H.J. Inc.*, 492 U.S. at 243 n. 4, 109 S.Ct. 2893.[2]

## IV. State Law Claims

 Because the Court has dismissed all of plaintiffs' federal claims, it must now consider whether to retain jurisdiction over plaintiffs' state law claims. Where it has original jurisdiction over a claim, a federal district court may exercise supplemental jurisdiction over all other claims that are so related to that claim that they form part of the same case or controversy. 28 U.S.C. § 1367(a). State law claims are deemed to be part of the same case or controversy as a federal claim if they " 'derive from a common nucleus of operative fact' and are such that one would ordinarily expect them to be tried in one judicial proceeding." *People by Abrams v. Terry*, 45 F.3d 17, 23 n. 7 (2d Cir.1995) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). In deciding whether to exercise supplemental jurisdiction, the Court should consider whether an exercise of jurisdiction is justified by the interests of judicial economy, convenience, fairness to litigants, and comity. *See Car-*

---

**2.** Because plaintiffs have failed to allege facts supporting a finding of continuity sufficient to support their RICO claims, the Court need

not address the other grounds for dismissal of these claims raised by defendants' motion.

*negie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Where all federal claims have been dismissed before trial, these factors generally "point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.; see also Rounseville v. Zahl,* 13 F.3d 625, 631 (2d Cir.1994). Nevertheless, district courts have broad discretion to exercise supplemental jurisdiction over state law claims even after all federal claims have been dismissed. *See Purgess v. Sharrock,* 33 F.3d 134, 138–39 (2d Cir.1994); *see also City of Chicago v. International College of Surgeons,* 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (district court may consider, *inter alia,* the "circumstances of the particular case" in deciding whether to exercise supplemental jurisdiction); *Ackerman v. National Property Analysts,* 887 F.Supp. 494, 510 (S.D.N.Y.1992) (retaining supplement jurisdiction over state law claims following 12(b)(6) dismissal of federal securities and civil RICO claims). In the present case, plaintiffs have set forth state law claims sounding in conversion, contract and quasi-contract, all arising from the same set of factual circumstances as their RICO claims. Given the time and effort already invested in this matter by the parties and the Court, the burden that serving multiple defendants in a state court action would impose on plaintiffs and the serious nature of plaintiffs' allegations, the Court elects to retain jurisdiction over the plaintiffs' state law claims.

## CONCLUSION

The Court grants the motion to dismiss plaintiffs' RICO claims. The Court retains jurisdiction over plaintiffs' state law claims.[3]

**SO ORDERED**

---

**3.** In the complaint, the RICO claims are set forth as claims one through eight; the state law claims are nine through fifteen.